199 B.R. 709 (1996)
In re Stanley Mark COHEN, Debtor.
Gary A. PLOTKIN, Chapter 7 Trustee, Appellant,
v.
POMONA VALLEY IMPORTS, INC., et al., Appellees.
Gary A. PLOTKIN, Chapter 7 Trustee, Appellant,
v.
METRO HONDA, et al., Appellees.
BAP Nos. CC-95-1084-KHJ, CC-95-1587-KHJ, CC-95-1049-KHJ and CC-96-1588-KHJ. Bankruptcy No. LA-91-92813-KL. Adv. Nos. LA-93-04282-KL, LA-93-04283-KL.
United States Bankruptcy Appellate Panel of the Ninth Circuit.
Argued and Submitted May 22, 1996.
Decided August 16, 1996.
*710 *711 Barry S. Glaser, Los Angeles, CA, for appellant.
Gregory M. Salvato, Los Angeles, CA, for appellees.
*712 Before KLEIN,[1] HAGAN, and JONES, Bankruptcy Judges.

OPINION
CHRISTOPHER M. KLEIN, Bankruptcy Judge:
The differences between the fraudulent transfer provisions in the Bankruptcy Code and the Uniform Fraudulent Transfer Act are central to this appeal. In furtherance of a Ponzi scheme, the debtor bought luxury goods at retail from two merchants who delivered them at the debtor's instructions to Ponzi participants. After the Ponzi scheme collapsed, the bankruptcy trustee brought fraudulent transfer actions against the merchants, attacking some purchases under Bankruptcy Code § 548 and others under California's version of the Uniform Fraudulent Transfer Act ("UFTA").
The Bankruptcy Code makes the debtor's purchases from the merchants fraudulent transfers because the debtor intended to hinder, delay, or defraud creditors when purchasing goods that were central to the Ponzi scheme. But the merchants have no ensuing liability because they qualify for the safe harbor that shelters transferees who give full value to the debtor in good faith.
UFTA, in contrast, makes the transfers not avoidable against the merchants because, although they were made with actual intent to hinder, delay, or defraud creditors, the merchants took debtor's money in good faith for a reasonably equivalent value.
The bankruptcy court granted the merchants' motions for summary judgment. We AFFIRM.

JURISDICTION
Original subject-matter jurisdiction was founded on 28 U.S.C. § 1334(b). This was a "core proceeding" that the bankruptcy court was empowered to hear and determine. 28 U.S.C. § 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

STANDARD OF REVIEW
Orders granting summary judgment are reviewed de novo. Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 593 (9th Cir.1991). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are genuine issues of material fact and whether the bankruptcy court correctly applied relevant substantive law. Id.

FACTS
Stanley Cohen ("Cohen") concocted a not-very-clever, I-can-get-it-for-you-wholesale Ponzi scheme in which he accepted money from prospective purchasers of premium merchandise and used the funds to buy goods at retail, which he then had the merchants deliver to individuals designated by Cohen. The scheme's inevitable collapse landed Cohen in prison and left a number of unsatisfied customers who had paid Cohen money and received nothing.
The goods were fancy automobiles. The merchants were automobile dealers. Cohen's customers were entertainment industry figures whom he perceived as being in a position to enhance his spouse's media career.
In the typical transaction, Cohen would announce that he could obtain a Mercedes Benz 500SL[2] promptly for $80,000 despite a sticker price of $114,500.[3] Several people would each pay Cohen $80,000. Cohen then would go to a dealer, say that he was working on behalf of his spouse's company or that he was agent for various individuals, sign contracts to purchase as many vehicles as his funds allowed, and write checks for the full $114,500 for each vehicle.
The dealer, confirming that funds on deposit with the drawee bank were sufficient to honor the check but not otherwise investigating *713 Cohen's bona fides, would identify vehicles to the contracts. Cohen would then tell the dealer to whom to deliver (and place in title on) the vehicles.
Neither the numbers of vehicles involved nor the payment in full were, in the experience of the dealers, extraordinary. If the dealers had investigated Cohen's creditworthiness in greater detail, they would have discovered that he had once filed a bankruptcy case. In fact, he had a history of involvement in financial frauds dating back to the 1940's.
Since Cohen was losing $34,500 per vehicle, the number of vehicles he purchased was always lower than the number of persons who had paid him $80,000. Other people's payments were used to make up the shortfall.

PROCEDURAL HISTORY
The case trustee sued the dealers in two adversary proceedings to avoid seventeen transactions as fraudulent transfers, seeking to obtain the difference between the price Cohen paid and the amount paid to Cohen by the individuals to whom the goods were transferred.[4] The seven purchases that occurred within one year before bankruptcy are attacked under Bankruptcy Code § 548(a)(1), and the remainder are attacked under UFTA § 4 as adopted in California, which applies through the trustee's "strong arm" power. 11 U.S.C. § 544(b); Cal.Civ. Code § 3439.04(a) (UFTA § 4(a)(1)).
The trustee's theory was that the act of delivering $114,500 vehicles to individuals who had paid Cohen $80,000 was a transfer distinct from the $114,500 purchase. This putative second transfer gave Cohen value only to the extent of extinguishing his $80,000 refund obligation to the person who took delivery, which does not qualify for the Bankruptcy Code safe harbor that protects transferees, including merchants, to the extent value is given in good faith "to the debtor." 11 U.S.C. § 548(c). Similarly, the trustee contended it was not "reasonably equivalent value" for purposes of the analogous UFTA safe harbor. Cal.Civ.Code § 3439.08(a) (UFTA § 8(a)) (West Supp.1996).
The bankruptcy court granted the dealers' motions for summary judgment on the two adversary proceedings, reasoning that there were no fraudulent transfers because Cohen received value from the dealers equal to the retail price that he paid and because the deliveries to individuals designated by Cohen, together with the concomitant titling, were not separately cognizable transfers. The trustee's appeals were heard together as related appeals and will be resolved as such.

DISCUSSION
Although we agree with the trial court's result and its analysis under UFTA, we parse the Bankruptcy Code's fraudulent transfer provision differently: Cohen's actual fraudulent intent suffices to make his retail purchases avoidable as fraudulent transfers, but there is no remedy against dealers who in "good faith" gave "value to the debtor" equal to the prices paid because they are entitled to retain the money that they received.

I
The analysis begins by placing the transfers within the construct of commercial law. The question is whether an ordinary sale of goods by a merchant can be disaggregated to make delivery separate from sale.

A
We look for the answer in the state law governing the transactions between Cohen and the dealers, which, in this instance, is Article 2 of the Uniform Commercial Code ("UCC") as adopted in California. Suburban Motors, Inc. v. State Farm Mut. Auto. Ins. Co., 218 Cal.App.3d 1354, 1359, 268 Cal.Rptr. 16, 18 (1990); English v. Ralph Williams Ford, 17 Cal.App.3d 1038, 1046, 95 Cal.Rptr. 501, 505 (1971) ("sales of automobiles are clearly subject to the sales division of the Uniform Commercial Code").
*714 A "sale" is the "passing of title from the seller to the buyer for a price." Cal.Comm. Code § 2106 (West 1964).
The passing of title to goods cannot occur before goods are identified to the contract. Thereafter, title can pass in any manner and on any conditions explicitly agreed upon by the parties. Id. § 2401(1) (West Supp.1996). During the interval between the time the goods are identified to the contract and title passes, the buyer has a "special property" in the goods. Id.
In the absence of explicit agreement, title passes to the buyer when and where "the seller completes his performance with reference to the physical delivery of the goods". Id. § 2401(2) (West Supp.1996).
Applying this state law regime to the summary judgment facts, goods were identified to the contract when Cohen paid the dealers, following which Cohen had a "special property" in the vehicles. They agreed that the sellers would complete their performance with reference to physical delivery by delivering the vehicles in accordance with Cohen's instructions. When delivery was completed, title passed to Cohen.
The appellant, however, argues that we should ignore the title-passing provisions of the UCC and instead rely upon a statutory procedure for titling a vehicle under California law that purports to make transfers ineffective pending compliance with motor vehicle titling procedures, the effect of which would have the dealers passing title directly to Cohen's customers. Cal.Veh.Code § 5600 (West Supp.1996).
Vehicle Code § 5600 does not, however, make the UCC inapplicable. California courts have long construed Vehicle Code § 5600 to refer to legal title but not equitable title and have held that equitable title does pass at the time of delivery. Stoddart v. Peirce, 53 Cal.2d 105, 116-17, 346 P.2d 774, 780 (1959); People v. Aiken, 222 Cal.App.2d 45, 48, 34 Cal.Rptr. 828, 830-31 (1963).
In other words, "transfer of the property interest in a motor vehicle is effective as between the immediate parties even though they have not complied with the registration statute." Security Pac. Nat'l Bank v. Goodman, 24 Cal.App.3d 131, 136, 100 Cal.Rptr. 763, 768 (1972); Rodgers v. Schneider (In re Laguna Beach Motors, Inc.), 148 B.R. 322 (9th Cir. BAP 1992). Once equitable title has passed, a dealer who has not retained a security interest has attenuated rights in the vehicle. English, 17 Cal.App.3d at 1046-47, 95 Cal.Rptr. at 505-06 (repossession constituted conversion).
Harmonizing Vehicle Code § 5600 with the subsequently-enacted UCC is straightforward. UCC Article 2 does not impair or repeal any statute regulating sales to consumers or specified classes of buyers. Cal.Comm.Code § 2102 (West 1964). Vehicle Code § 5600 supplements the UCC and operates to vary UCC provisions and only to the extent where directly in conflict. English, 17 Cal.App.3d at 1046, 95 Cal.Rptr. at 505-06. The focus is on UCC § 2401(1), which permits the parties, once goods have been identified to a contract, to provide for passing of title "from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." Cal.Comm. Code § 2401(1) (West Supp.1996). Only the word "explicitly" stands in the way of giving Vehicle Code § 5600 full effect as a "manner" or "condition" on passing title under UCC § 2401(1) that applies, by operation of law, as an implicit term in every California motor vehicle sales contract. Accordingly, "explicitly" conflicts with Vehicle Code § 5600 and is inoperative in UCC § 2401(1) with respect to motor vehicle sales.
During the interim before title formally passed, Cohen's "special property" in the vehicles that is recognized by UCC § 2401(1) included equitable title. In view of Cohen's payment in full with checks that the drawee bank honored, there was no other implicit condition on delivery. Cal.Comm.Code § 2511 (West Supp.1996). The legal title that remained with the dealers pending compliance with Vehicle Code § 5600 was of only nominal value. English, 17 Cal.App.3d at 1048, 95 Cal.Rptr. at 507. The dealers were obliged to deliver the vehicles in accordance with Cohen's instructions and were, in practical effect, required to act as Cohen's agents in that respect.
*715 When the dealers delivered the vehicles per Cohen's instructions, Cohen's equitable title passed to the fortunate Ponzi scheme participants who actually received vehicles pursuant to their separate transactions with him. When the dealers submitted documentation to California authorities showing title in the names designated by Cohen, that operated to transfer legal title as provided in Vehicle Code § 5600, at which point legal title merged with equitable title.
Since delivery is integral to the passing of title that is an essential component of a sale of goods by the merchants to Cohen, delivery cannot be disaggregated from the sale and treated as a separate transaction. The transaction between Cohen and his Ponzi scheme participants was a different transaction.

B
Our conclusion that the vehicles were transferred first to Cohen and then to some of his Ponzi scheme participants is also informed by the analysis of what constitutes a transfer for purposes of fraudulent transfer law.
The so-called "dominion" or "control" test determines who is a transferee and requires, at a minimum, "dominion over the money or other asset, the right to put the money [or asset] to one's own purposes" such as to "invest in lottery tickets or uranium stocks." Danning v. Miller (In re Bullion Reserve), 922 F.2d 544, 548-49 (9th Cir.1991), approving and paraphrasing Bonded Fin. Servs., Inc. v. European American Bank, 838 F.2d 890, 893-94 (7th Cir.1988) (Easterbrook, J.); McCarty v. Richard James Enter., Inc. (In re Presidential Corp.), 180 B.R. 233, 236 (9th Cir. BAP 1995).
Under this test, Cohen is plainly the dealers' transferee of the vehicles. He had the exclusive power to designate the persons to whom the vehicles would be delivered. He could even have traded them for lottery tickets or uranium stocks.
And we are admonished to step back and evaluate the transaction as a whole to make sure that our conclusions are logical and equitable. Bullion Reserve, 922 F.2d at 549; Presidential Corp., 180 B.R. at 236.
Viewing the transaction in its entirety, the logical and equitable construct has Cohen not acting as the agent of any particular Ponzi scheme participant. He had the unfettered power to designate to whom the vehicles would be transferred. Once equitable title passed to Cohen, the dealers were required to deliver the vehicles in accordance with his instructions and, as noted, were functioning as Cohen's de facto agents.
Logic and equity require that ordinary market-price sales by retail merchants acting in good faith not be contorted beyond commercial practice for the purpose of expanding the merchant's status as a captive risk taker. Routine commercial practice has retail merchants selling goods to one individual and delivering them to, or holding them for pickup by, another individual. So long as a merchant has no reason to suspect the customer's Ponzi scheme or other skullduggery, sales made under ordinary commercial terms should be viewed as transactions between merchant and customer. Whether such a sale is avoidable in a manner that exposes the merchant to liability should depend upon the substantive merits of the merchant-customer transaction, not on some artificiality of form.

II
We next clarify some points about fraudulent transfers so that common misconceptions do not cloud the analysis. A key problem is that the word "fraudulent" has such pejorative connotations that it becomes difficult to think dispassionately in the presence of a blameless transferee.
Fraudulent transfers are subdivided into actually fraudulent transfers and constructively fraudulent transfers under both Bankruptcy Code § 548(a)[5] and *716 UFTA §§ 4 and 5.[6]
Actually fraudulent transfers are made avoidable by Bankruptcy Code § 548(a)(1) and UFTA § 4(a)(1).[7] Constructively fraudulent transfers are made avoidable by Bankruptcy Code § 548(a)(2) and UFTA §§ 4(a)(2) and 5.[8]
Fraud, in the sense of morally culpable conduct, need not be present in either category of fraudulent transfer. An actually fraudulent transfer could, in principle, occur without genuine fraud.
Finally, the determination that the transfer is fraudulent is conceptually distinct from the avoidance of the transfer, which is, in turn, separate and distinct from a recovery based upon the avoidance of a transfer.
The avoidance of a transfer as fraudulent does not necessarily lead to a remedy against transferees. The fraudulent transfer statutes provide carefully crafted remedies and limitations on remedies. Not every transferee is liable. Subsequent good faith transferees often have no liability. See Bay Plastics, Inc. v. BT Commercial Corp., 187 B.R. 315, 336 (Bankr.C.D.Cal.1995).

III
The analysis of Cohen's transactions with the dealers diverges as between the Bankruptcy Code and UFTA and requires a progression of three questions. Is the transfer fraudulent? Is it avoidable? Is the defendant liable in consequence of the avoidance?

A
Whether Cohen's purchases were actually fraudulent as having been made with actual intent either to hinder or to delay or to defraud creditors is the same under the Bankruptcy Code and UFTA. 11 U.S.C. § 548(a)(1); Cal.Civ.Code § 3439.04(a) (West Supp.1996).
The focus in the inquiry into actual intent is on the state of mind of the debtor. *717 Neither malice nor insolvency are required. Culpability on the part of the dealer transferees is not essential.
Unlike constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent. 2 David G. Epstein, et al., Bankruptcy § 648 (1992); accord 4 Lawrence P. King, Collier on Bankruptcy ¶ 548.02 (15th ed. 1996); Peter A. Alces, The Law of Fraudulent Transactions ¶ 5.03 (1989). Conversely, the transferor's intent is immaterial to the constructively fraudulent transfer in which the issue is the equivalence of the consideration coupled with either insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature.
Under these rules, any market-price transaction with a debtor who has the requisite state of mind to hinder creditors, to delay creditors, or to defraud creditors may qualify as an actually fraudulent transfer.
Transfers made in furtherance of Ponzi schemes have achieved a special status in fraudulent transfer law. Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for purposes of actually fraudulent transfers under Bankruptcy Code § 548(a)(1). E.g., Hayes v. Palm Seedlings Partners-A (In re Agricultural Research & Technology Group, Inc.), 916 F.2d 528, 535-36 (9th Cir.1990).
Here, there is no genuine issue of material fact that Cohen was running a Ponzi scheme involving the automobiles that he was purchasing from the dealers. The scheme for which he was sent to prison differed from the pure investment Ponzi scheme in which the funds invested by later investors are used to pay continuing dividends to earlier investors.[9] Rather, this scheme involved an "investment" of a bargain price up front for an automobile for which there was a one-time return in the form of delivery of the vehicle purchased in part with the "investment" funds of subsequent participants. Like all Ponzi schemes, the return was too good to be true.
Cohen was no stranger to financial frauds. He knew that as he continued to buy high and sell low with the funds provided by the scheme participants that it was doomed to collapse. He knew that his "investors" were his creditors because he owed them either a vehicle or their money back. And he knew that when it collapsed there would be no vehicle and no money left for refunds.
The summary judgment evidence establishes that Cohen had the requisite intent to hinder, delay, or defraud creditors when he purchased vehicles in furtherance of his Ponzi scheme. The transfers were actually fraudulent under Bankruptcy Code § 548(a)(1) and Cal.Civ.Code § 3439.04(a).

B
The answer to the question whether the actually fraudulent transfer is avoidable differs between the Bankruptcy Code and UFTA.
The Bankruptcy Code makes every fraudulent transfer avoidable and proceeds to protect the interests of the innocent and the unlucky in two ways. The remedies available under § 550 are limited. 11 U.S.C. § 550.[10] *718 And § 548(c) grants to good faith transferees who give value to the debtor either a lien or the privilege of retaining the interest transferred to the extent of such value. 11 U.S.C. § 548(c).[11]
The Congress was explicit about the distinction between avoiding a transfer and recovering on account of the avoidance, explaining that § 550 "enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee." House Rep. No. 95-595, 95th Cong., 1st Sess. 375-76 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 90 (1978); Lippi v. City Bank, 955 F.2d 599, 605 (9th Cir. 1992); Kendall v. Sorani (In re Richmond Produce Co.), 195 B.R. 455, 463 (N.D.Cal. 1996).
UFTA parts company from the Bankruptcy Code and does not avoid every fraudulent transfer. Instead of affording good faith transferees for value the power either to retain the transferred property or to enjoy a lien to the extent of value given to the debtor, UFTA provides that in the case of actually fraudulent transfers to persons who take "in good faith and for a reasonably equivalent value", the transfer is not avoidable as against such person or such person's transferees. Cal.Civ.Code § 3439.08(a) (West Supp.1996).[12]
These differences between the Bankruptcy Code and UFTA force divergent analyses of the avoidability of Cohen's transactions.

1
The seven vehicles purchased during the year before bankruptcy are Bankruptcy Code fraudulent transfers that are all avoidable without further analysis. The fact that they were retail purchases does not affect the avoidability of the transfers but does become pertinent to the dealers' liability.

2
The retail nature of the remainder of Cohen's purchases does matter to avoidability under UFTA. The transfers would not be avoidable if the dealers took in "good faith and for a reasonably equivalent value" when they sold for a market price. Conceding that a retail sale constitutes reasonably equivalent value, the trustee disputes the dealers' "good faith" and contends that they are chargeable with knowledge, by way of inquiry notice, of the Ponzi scheme.
The issue of good faith under UFTA § 8(a) is a defensive matter as to which the defendants asserting the existence of good faith have the burden of proof. UFTA *719 § 8(a), comment (1); cf., Agricultural Research, 916 F.2d at 535.
One lacks the good faith that is essential to the UFTA § 8(a) defense to avoidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction. UFTA § 8(a), comment (2) (knowing facts rendering transfer voidable "would be inconsistent with the good faith that is required of a protected transferee"). Such inquiry notice suffices on the rationale that some facts suggest the presence of others to which a transferee may not safely turn a blind eye. Cf., Bonded Fin. Servs., 838 F.2d at 893; Richmond Produce Co., 195 B.R. at 464.
While there is some conflict in the summary judgment evidence on the question whether the dealers were on inquiry notice that a Ponzi scheme was being perpetrated, the divergence is not of sufficient magnitude to create a genuine issue of material fact. Cohen was issuing personal checks that were being honored by the drawee bank. The dealers were under no duty to scrutinize his creditworthiness further or to inquire as to the source of his funds. Presidential Corp., 180 B.R. at 239. The existence of the prior bankruptcy that might have been discovered is not sufficiently connected to a suggestion of fraud as to place the dealers on inquiry notice. If anything, knowledge of the prior bankruptcy would not ordinarily suggest fraud and would have made the dealers more desirous of the immediate payment that Cohen was making. Nor is there direct rebuttal of the dealers' evidence that it is not uncommon in the particular market for individuals to act as intermediaries or agents of others.
In sum, the trustee has not provided summary judgment evidence that would permit a rational trier of fact to conclude that the dealers should have suspected that Cohen was cheating his creditors. The dealers were not on inquiry notice of the Ponzi scheme.
Accordingly, the purchases that Cohen made from the dealers before bankruptcy are not avoidable under UFTA because the dealers successfully established the UFTA § 8(a) defense that they made the sales in good faith and for reasonably equivalent value.
Since the transfers are not avoidable under UFTA, we need not assess the applicability of UFTA remedies.

C
There remains the question of the effect of the avoidance of the seven transfers that occurred within one year before bankruptcy, which are avoidable under Bankruptcy Code § 548 as actually fraudulent transfers made in furtherance of a Ponzi scheme.
The liabilities of transferees of avoided transfers are specified at Bankruptcy Code § 550. Although the general rule is that transferees are liable either to return the property or pay its value, there are several safe harbors.
In addition, the Bankruptcy Code insulates the transferees of an avoided fraudulent transfer who take for value and in good faith by providing that such a transferee has a lien, or may retain the interest transferred, to the extent the transferee gave "value to the debtor" in exchange for the transfer. 11 U.S.C. § 548(c).
Subsequent transferees, i.e. transferees of the initial transferee, who take for value without knowledge of the voidability of the original fraudulent transfer are not liable for any recovery. 11 U.S.C. § 550(b)(1). Nor are their subsequent good faith transferees liable. 11 U.S.C. § 550(b)(2).
In circumstances in which there is liability, any good faith transferee  initial, immediate, or subsequent  is entitled to a lien on the transferred property to secure the lesser of costs of improvements not recovered from profits or the increase in value as a result of the improvements. 11 U.S.C. § 550(e)(1). Improvements are broadly defined to include payment of taxes, payment of certain senior secured debt, and expenses of preservation of the property. 11 U.S.C. § 550(e)(2).
Here, the dealers enjoy the safe harbor of Bankruptcy Code § 548(c) for essentially the same reasons that the transfers are not avoidable under UFTA.
*720 Our analysis of inquiry notice under UFTA § 8(a) applies with equal force to Bankruptcy Code § 548(c). Facts sufficient to warrant a finding of inquiry notice are also sufficient to defeat the good faith that is essential to the § 548(c) safe harbor. Bonded Fin. Servs., 838 F.2d at 893; Richmond Produce Co., 195 B.R. at 464. The dealers have, as already noted, successfully established that there is not a genuine issue of material fact regarding their good faith.
The dealers' rights to retain the property transferred (i.e. the funds paid for the vehicles) are limited to the extent they gave "value to the debtor" in exchange for the transfer. 11 U.S.C. § 548(c). The trustee's position is that the value went to the Ponzi participants and extinguished Cohen's refund obligations to them by the amounts they had paid him. As explained in the first section of this opinion, we view the transaction differently.
Under ordinary principles of commercial law, Cohen received full value for his purchases at the time the vehicles were identified to the contract. This is the rule generally applicable to any retail transaction with a merchant who sells goods for a market price.
The fact that the goods are motor vehicles adds a complication because of the state's statutes regarding motor vehicle titles, but it does not change the analysis in its essential respects. That the transfer of title may only have been equitable pending compliance with the state's motor vehicle titling procedure does not affect the conclusion that the value given in exchange was equal to the full retail value of each vehicle.
The dealers, accordingly, qualify for the § 548(c) safe harbor. They may retain the funds that Cohen paid them.

* * * * * *
In sum, the dealers sold the goods to Cohen, not to his designees. Cohen's transactions with his Ponzi scheme participants were different transactions. The transfers exchanged between Cohen and the dealers are all fraudulent because they were made in furtherance of the actual fraud that Cohen was perpetrating in his Ponzi scheme. None of the transfers are avoidable under the Uniform Fraudulent Transfer Act because the dealers took Cohen's money in good faith for reasonably equivalent value. Although some of the transfers are avoidable under Bankruptcy Code § 548, the dealers qualify for the safe harbor demarked by good faith and value given to the debtor and are entitled to retain the money they received.
The orders of the bankruptcy court are AFFIRMED.
NOTES
[1] The Honorable Christopher M. Klein, United States Bankruptcy Judge for the Eastern District of California, sitting by designation.
[2] Seven of the seventeen transactions at issue in this appeal involved Mercedes Benz 500SL's.
[3] Including taxes and related transaction costs. The sums used in this summary are approximate but are within 1 percent of the actual figures for the Mercedes Benz 500SL transactions.
[4] He also sued the individuals who actually received the vehicles. Those actions are not involved in this appeal.
[5] Bankruptcy Code § 548(a) provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily 
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a).
[6] As to present and future creditors:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.
Cal.Civ.Code § 3439.04 (West Supp.1996) (adopting UFTA § 4(a) without substantive change but omitting § 4(b) list of eleven nonexclusive factors indicative of actual intent).
As to present creditors:
A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
Cal.Civ.Code § 3439.05 (West Supp.1996) (adopting UFTA § 5(a) without change but omitting § 5(b) relating to transfers to insiders).
[7] UFTA § 4(a)(1) has been adopted in California as Cal.Civ.Code § 3439.04(a) (West Supp.1996).
[8] UFTA §§ 4(a)(2) & 5 have been adopted in California as Cal.Civ.Code §§ 3439.04(b) & 3439.05 (West Supp.1996).
[9] The term Ponzi scheme derives from what Chief Justice Taft described as "the remarkable criminal career of Charles Ponzi." Cunningham, Trustee of Ponzi v. Brown, 265 U.S. 1, 7, 44 S.Ct. 424, 425, 68 L.Ed. 873 (1924); see D. DUNN, PONZI: THE BOSTON SWINDLER 247-48 (1975). In its classic form:

A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any "profits" of the underlying business venture. The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment.
Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 590 n. 1 (9th Cir.1991).
[10] Bankruptcy Code § 550 provides, in pertinent part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from 
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under subsection (a)(2) of this section from 
(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.
. . . .
(e)(1) A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of 
(A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and
(B) any increase in the value of such property as a result of such improvement, of the property transferred.
11 U.S.C. § 550(a), (b) & (e)(1).
[11] Bankruptcy Code § 548(c) provides:

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544 [including UFTA], 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.
11 U.S.C. § 548(c).
[12] This subsection provides:

(a) A transfer or an obligation is not voidable under subdivision (a) of Section 3439.04 [UFTA § 4(a)(1)], against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.
Cal.Civ.Code § 3439.08(a) (West Supp.1996) (adopting UFTA § 8(a) without substantive change).