FILED

JUL 20 2023

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>WELSCORP, INC.,<br>　　　　　　　　Debtor. | BAP No. NV-23-1031-BGC<br><br>Bk. No. 19-18056-ABL |
| WILLIAM CASTALDI; KARIN CASTALDI,<br>　　　　　　　　Appellants,<br>v.<br>LENARD SCHWARTZER, Chapter 7 Trustee,<br>　　　　　　　　Appellee. | Adv. No. 21-01175-ABL<br><br>**MEMORANDUM**∗ |

Appeal from the United States Bankruptcy Court
for the District of Nevada
August B. Landis, Chief Bankruptcy Judge, Presiding

Before: BRAND, GAN, and CORBIT, Bankruptcy Judges.

### INTRODUCTION

Appellants William and Karin Castaldi appeal an order granting appellee, chapter 7[1] trustee Lenard E. Schwartzer ("Trustee"), summary judgment against them under §§ 544, 548, and 550, and NRS § 112.180(1)(a).

---

∗ This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "NRS" references are to the Nevada Revised Statutes.

1

Trustee sought to avoid and recover the debtors'[2] actual fraudulent transfers to the Castaldis in furtherance of an alleged Ponzi scheme. Because the Castaldis failed to establish that any genuine issue of material fact existed for trial, particularly whether the debtors were running a Ponzi scheme, the bankruptcy court did not err in granting Trustee summary judgment and entering a judgment against the Castaldis for $924,500. Accordingly, we AFFIRM.

## FACTS

**A.     Events leading to the adversary complaint against the Castaldis**

The relevant facts are essentially undisputed. From August 2014 until shortly before creditors filed their involuntary chapter 7 petitions on December 20, 2019, debtors Welscorp, Inc. and its affiliates and principals (collectively, "Debtors") operated an investment scheme that offered investors 250% to 600% returns from a pooled investor fund used to bet on sporting events. Debtors' principals, John F. Thomas, III (aka Jonathan West, John Rodgers, John Frank, and John Marshall) and Thomas Becker, claimed to have created a proprietary sports betting algorithm that was highly accurate in predicting the outcome of sporting events.[3] Thomas and Becker, through the Debtor entities and the services of their broker-agents, raised at least $29.5 million from 600 investors

---

[2] Debtors include several entities and their principals: Welscorp Inc.; Einstein Sports Advisory Ltd.; QSA LLC; Wellington Sports Club LLC; Vegas Basketball Club LLC; Vegas Football Club LLC; Boston Biometrics LLC; Sports Psychometrics LLC; ESA Ltd.; No-More-Bad-Hires, Inc.; John F. Thomas, III; and Thomas Becker.

[3] In 1991, Thomas and Becker were convicted of felony money laundering and conspiracy arising from another fraudulent scheme. Thomas used the alias "Jonathan West" during the time Debtors ran their sports betting investment scheme, perhaps to prevent investors from discovering his past conviction.

in more than 40 states with their "low-risk, high-yield" sports betting investment scheme. The individual investors deposited amounts ranging from less than $10,000 to over $500,000. Debtors did not do any vetting of their investors to determine if they were accredited and could survive a financial loss. Many investors were unsophisticated and placed a substantial percentage of their net worth (including savings and retirement accounts) with Debtors.

Debtors promised their investors "absolute security and instant liquidity," compounding returns that grow "a quadrillion times faster" than investments by Warren Buffet, or total growth of funds "a quintillion-fold." The investor agreements set forth how Debtors would grow the investor's initial investment to a target amount. Once the target was reached, the investor could cash out and get 50% of the target amount; Debtors would get the other 50%. An investor could also choose to roll over some or all the earnings into a new agreement.

Prospective investors were lured into investing through personalized access to a website that provided them with "demonstrations" of how their potential investment would grow over time. After committing money to Debtors, the investors' login credentials allowed them to monitor bets and track their individual "winnings" online.

The websites, however, contained incorrect, falsified, or mismanaged accounting information. For example, on February 11, 2017, investors were shown that their accounts increased by $5,344,262, but betting slips from that day showed they earned only $105,782.50. On May 12, 2018, investors were

shown that betting generated $60.5 million in profits, but betting slips from that day showed only $119,536.40 in actual winnings. Many investors chose to reinvest their "winnings" because they were impressed with the rate of growth they saw in their personalized spreadsheets on the website. In reality, Debtors' sports betting activity generally lost money. Thomas and Becker never achieved the winning rates represented to investors.

When investors demanded payment, Thomas and Becker would say they had the funds but often claimed they could not pay for a host of reasons, such as the winnings were in cash and they could not deposit large amounts of cash into bank accounts for fear of being prosecuted for money laundering or other crimes. Most, if not all, investors were not paid out the full balance shown in their online accounts, and many were not paid back anything at all, even their initial investments, despite their accounts reflecting much higher amounts. If an investor was paid, it was frequently with money from other investors, not winnings from sports betting. There was evidence that some of these investors were paid because Debtors' brokers suggested that doing so could lead to a larger amount of new money coming in. The investor agreements did not disclose any use of investor funds other than for betting, and investors did not know their funds were being used to pay returns to other investors – i.e., Ponzi payments – or being used by Debtors' principals for personal expenses and for payment of broker commissions.

The Castaldis met Thomas in 2011 through a mutual friend. They were check cashers for Debtors. Between them, the Castaldis cashed at least 127 of

what they characterized as "petty cash"[4] checks for Debtors. In return, the Castaldis kept $50 from each check for "token gas money" compensation. Mr. Castaldi also received a check for $25,000, signed by Becker on December 25, 2017, which contained in the memo portion the words "Merry Christmas". Except for the $50 gas money allowance per check and the $25,000 payment, the Castaldis returned the funds from the cashed checks to Debtors.

In August 2019, the Securities and Exchange Commission ("SEC") filed a civil action against Debtors and some associated brokers in the District of Nevada, alleging multiple securities violations. The SEC alleged that Debtors conducted little sports betting and used only a small portion of investor funds for betting. Instead, investor funds were misappropriated to fund Thomas and Becker's personal lifestyles, pay commissions to brokers and agents, or make Ponzi payments. The SEC alleged that, in total, Thomas and Becker spent more than 85% of investor funds on something other than betting. In addition, none of Debtors' investment offerings were registered with the SEC, and none of Debtors' named salespersons were registered securities brokers.

The SEC also obtained an injunction to enjoin Debtors from any further investment activities and to freeze their monies and assets. In support, the SEC submitted a declaration from Deborah Russell, a long-time staff accountant in the SEC's Division of Enforcement. Based on her extensive review of Debtors' bank records and her reconstruction of Debtors' books and records, Russell opined that Debtors were running a Ponzi scheme. Russell concluded that, at

---

[4] The "petty cash" checks totaled $899,500 over the course of 18 months.

5

most, $4,480,847.07 (or 15%) of the nearly $30 million Debtors raised from investors may have been used for betting activities on behalf of investors. Russell further concluded that at least $11,616,332.72 of the $13,222,296.55 paid to investors (88%) was in Ponzi payments. Thomas and Becker asserted their Fifth Amendment rights during questioning at their depositions, failing to answer even basic questions about their enterprise.

Ultimately, Debtors defaulted in the SEC civil action and final judgments of default were entered against them in April 2021. The default judgments enjoined Thomas and Becker from selling securities in the future and ordered them to disgorge over $8 million of illegal profits and pay a civil penalty of $4 million. The Ninth Circuit Court of Appeals affirmed the default judgments in June 2022.

The state of Oregon also prosecuted Becker and some of the Debtor entities for state securities violations involving two investors. In 2018, Becker signed a consent order admitting to the violations. He was fined $35,000.

In October 2020, a grand jury indicted Thomas and Becker for thirteen counts of wire fraud and conspiracy to commit wire fraud in connection with the sports betting investment scheme, which was described in the indictment as a "Ponzi scheme." Those criminal charges are still pending.

B.    **Adversary complaint against the Castaldis**

Trustee filed an adversary complaint against the Castaldis, seeking to avoid and recover what he alleged were Debtors' actual fraudulent transfers of investor funds under §§ 544(b)(1), 548(a)(1)(A), 550 and NRS § 112.180(1)(a).

6

Trustee alleged that Debtors' sports betting investment scheme was a Ponzi scheme and that the Castaldis, as check cashers, were among the highest paid transferees in the fraud. Between December 11, 2017 and May 6, 2019, Mr. Castaldi received transfers totaling $897,500 and Mrs. Castaldi received transfers totaling $45,000 in exchange for their check cashing services which Trustee alleged perpetuated Debtors' Ponzi scheme.

The Castaldis admitted to receiving $50 per cashed check for gas money, but denied receiving any other funds from Debtors or that Debtors were running a Ponzi scheme. The Castaldis maintained that Trustee could not recover the gas money funds because they were made in exchange for value and the Castaldis received them in good faith.

Trustee then moved for summary judgment ("MSJ"). The MSJ was supported by a statement of undisputed facts, which in turn was supported by numerous documents, including evidence demonstrating (1) that Debtors' sports betting investment scheme was a Ponzi scheme, (2) the amount of checks cashed by the Castaldis, and (3) the Castaldis' admissions that they had no documents to corroborate any of their allegations, communications, or financial transactions with or relating to Debtors and their activities. Trustee argued that the transfers were made by Debtors with actual intent to defraud existing and future investors in furtherance of their Ponzi scheme. The Castaldis were compensated for directly enabling the fraudulent and wrongful use of investor funds, similar to the payment of commissions to brokers for soliciting investment.

7

Trustee asserted that the $893,150 the Castaldis effectively took from investors by withdrawing and returning the untraceable cash to Debtors had not been located or accounted for, which implied that the money was lost in Debtors' sports betting scheme or removed for concealment. Trustee argued that he could recover these funds from the Castaldis as immediate transferees. Trustee argued that he could recover the $31,350 retained by the Castaldis as final transferees. In total, the Castaldis were the final or immediate transferees of $924,500. Trustee argued that the Castaldis had no affirmative defense to the transfers under the Bankruptcy Code or Nevada law; they did not give value or reasonably equivalent value in exchange for the transfers, and they lacked good faith.

Trustee's expert accountant, Marc Ross, reviewed accountant Russell's declaration and the "tens of thousands of pages" of supporting documentary evidence from the SEC's litigation against Debtors. Ross also conducted his own independent investigation. While Ross conceded that he could not review Russell's privileged work product, he did not doubt the validity of her conclusions. Ross shared Russell's opinion that Debtors were running a Ponzi scheme that defrauded their investors out of millions of dollars and allowed them to fund lavish lifestyles for Thomas and Becker and their families. Ross opined that approximately $5.9 million (or 20%) of the nearly $30 million raised from investors may have been placed on actual bets, either for the benefit of the investors or Debtors' principals, and the vast majority of funds returned to investors as "winnings" were actually funded by Ponzi payments;

8

there was no evidence of deposits of "winnings" into Debtors' bank accounts that would have accounted for payment of any significant returns to investors. Ross opined that Debtors could not have done sufficient betting to pay the returns promised by the contracts and represented on the websites.

The Castaldis opposed the MSJ. They did not file a statement of undisputed facts or properly respond to Trustee's statement as required by local rule. They did, however, file a declaration from Thomas. The Castaldis disputed Trustee's assertion that Debtors ran a Ponzi scheme. Given Debtors' real-time betting system, the Castaldis argued that there was "no way" Debtors "could have faked their results or past-posted their betting picks," and the testimony would show that Debtors could not have falsified their winnings since investors were able to monitor how their investments were utilized through a website and a mobile app.

The Castaldis disputed Russell's "Ponzi scheme" opinion and took issue with her calculations for the total investor deposits for 2014. They also argued that, in the SEC default judgments, the Nevada District Court did not make a specific finding that Debtors were operating a Ponzi scheme. The Castaldis claimed that they were unaware of any fraud by Debtors, and that their check cashing services provided "reasonably equivalent value." The Castaldis further claimed that the Merry Christmas check was not a gift but was for the repayment of two $10,000 loans (plus interest) they made to Thomas in May and June of 2015. Thomas corroborated the Castaldis' assertion about the loans. Thus, argued the Castaldis, value was given for that transfer as well.

9

In reply, Trustee argued that the Castaldis had failed to show that any genuine issue of material fact was in dispute as to Debtors' Ponzi scheme. Instead, they offered an "alternate-universe" explanation of Debtors' investment scheme, in which there was "no way" gambling returns could have been faked. Trustee argued that the Castaldis' contention was implausible, especially against the plain evidence of Debtors' finances and known gambling results. Trustee argued that Debtors did not misrepresent their betting picks; they misrepresented the profit they generated, the effectiveness of their betting strategy, and the amount of betting performed and returns actually won. It was entirely possible for Debtors to have transparent, high-win-rate picks and still commit sports-betting fraud. The Castaldis had offered no other evidence or argument that might support a claim that Debtors were not actually engaged in fraud.

Trustee disputed the Castaldis' contentions about the Merry Christmas check being a gift or that reasonably equivalent value was given if it was a loan. Assuming it was a loan, it was admittedly personal loans to Thomas. Yet, the Merry Christmas check was drawn against the account of one of the Debtor entities and signed by Becker. Hence, investor funds were used to pay off these personal loans. Repayment of the Thomas loans with investor funds did not reduce any of the Debtor entities' obligations, but instead increased the gap between their obligations and their ability to pay. Satisfaction of a personal debt with misappropriated investment funds, argued Trustee, gave no conceivable reasonably equivalent value to Debtors. Further, it was not

10

plausible that the words "Merry Christmas" would be written on a loan payment.

After a hearing at which the Castaldis failed to appear, the bankruptcy court entered its oral ruling granting the MSJ in its entirety. The Castaldis did not order a transcript. The court's written order incorporated its oral ruling by reference and stated that: (1) Debtors were operating a Ponzi scheme; (2) Debtors made transfers to the Castaldis with actual intent to hinder, delay, or defraud creditors; (3) the transfers were deemed avoided; and (4) Trustee shall recover from the Castaldis $924,500, plus fees, costs, and prejudgment interest. This timely appeal followed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court err when it granted summary judgment in favor of Trustee?

## STANDARDS OF REVIEW

We review the appeal of a summary judgment ruling de novo. *Stadtmueller v. Sarkisian (In re Medina)*, 619 B.R. 236, 240 (9th Cir. BAP 2020), *aff'd*, No. 20-60045, 2021 WL 3214757 (9th Cir. July 29, 2021). Under de novo review, we view the evidence in the light most favorable to the nonmoving party to determine whether the moving party was entitled to judgment as a matter of law because no genuinely disputed issues of material fact needed to

11

be tried. *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 230 (9th Cir. BAP 2007), *aff'd in part, dismissed in part,* 551 F.3d 1092 (9th Cir. 2008). "When the material facts are not in dispute, our only function is to determine whether the bankruptcy court correctly applied the law." *Patow v. Marshack (In re Patow),* 632 B.R. 195, 202 (9th Cir. BAP 2021) (citation omitted), *aff'd,* No. 21-60051, 2022 WL 2256325 (9th Cir. June 23, 2022).

## DISCUSSION

### A.      Incomplete appellate record

The Castaldis had the burden of filing an adequate record to allow review of the order they appeal. *Drysdale v. Educ. Credit Mgmt. Corp (In re Drysdale)*, 248 B.R. 386, 388 (9th Cir. BAP 2000). Although we ordered them to do so, the Castaldis failed to order and submit a transcript of the bankruptcy court's oral ruling granting the MSJ. When findings of fact and conclusions of law are made orally on the record, a transcript of those findings is mandatory for appellate review. *McCarthy v. Prince (In re McCarthy),* 230 B.R. 414, 416-17 (9th Cir. BAP 1999). The lack of the transcript hinders our appellate review.

In addition, their opening brief does not contain a statement of facts, standard of review, summary of the argument, or any citations to legal authorities. *See* Rule 8014. Moreover, they attempt to raise issues on appeal that were not presented to the bankruptcy court. Despite their pro se status, the Castaldis must follow the same rules of procedure that govern other litigants. *Warrick v. Birdsell (In re Warrick)*, 278 B.R. 182, 187 (9th Cir. BAP 2002).

Based on the Castaldis' noncompliance with the rules and their failure to provide a sufficient record, we can dismiss the appeal or summarily affirm the bankruptcy court's ruling. *Kyle v. Dye (In re Kyle),* 317 B.R. 390, 393-94 (9th Cir. BAP 2004), *aff'd,* 170 F. App'x 457 (9th Cir. 2006). However, before summarily affirming or dismissing, we may exercise our discretion and consider whether an informed review can be conducted with the incomplete record provided. *Id.* Here, we will exercise our discretion to examine what record we have been provided, keeping in mind that we need only look for any plausible basis upon which the bankruptcy court could have made the decision it did. *In re McCarthy,* 230 B.R. at 417. "If we find any such basis, then we must affirm." *Id.* We find such basis here.

**B.    Summary judgment standards**

Civil Rule 56(a), applicable here by Rule 7056, provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute over material facts is genuine where a reasonable jury could return a verdict for the nonmoving party based on the evidence presented. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Once the movant has come forward with uncontroverted facts entitling it to relief, the burden shifts to the nonmovant to establish that there is a specific and genuine issue of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 n.3 (1986). The nonmovant "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery

material, to show that the dispute exists." *Barboza v. New Form, Inc. (In re Barboza),* 545 F.3d 702, 707 (9th Cir. 2008) (citation omitted). Conjecture, surmise or "metaphysical doubt" by the nonmovant of the movant's assertions will not defeat a summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The nonmovant's evidence must be probative. *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch),* 237 B.R. 160, 165 (9th Cir. BAP 1999). Even in cases where intent is at issue, summary judgment may be appropriate if the nonmovant rests merely upon conclusory allegations, improbable inferences, and unsupported speculation. *Id.*

In deciding whether material factual issues exist, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587-88. However, the court is required to do so only in circumstances where a fact specifically averred by the moving party is contradicted by specific evidence submitted in opposition to the motion. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). If a motion for summary judgment is properly supported and the nonmovant does not set forth specific facts showing a genuine issue for trial, summary judgment must be entered. Civil Rule 56(a); Rule 7056.

**C.    The bankruptcy court did not err in granting summary judgment.**

With actual fraudulent intent, the elements for an avoidance action are essentially the same for federal law and Nevada law (both statutes use the "hinder, delay or defraud" language). To prevail on his fraudulent transfer claims, Trustee had to show that:

(1) Debtors transferred an interest in property to the Castaldis;

(2) Debtors transferred the property during the applicable lookback period – two years prior to the petition date for § 548, and four years prior to the petition date for NRS § 112.180(1)(a); and

(3) Debtors made the transfer with actual intent to hinder, delay, or defraud a present or future creditor.

§ 548(a)(1)(A); NRS § 112.180(1)(a); § 544(b)(1) (authorizing trustee to avoid fraudulent transfers under state law); *Leonard v. Coolidge (In re Nat'l Audit Def. Network),* 367 B.R. 207, 218-19 (Bankr. D. Nev. 2007). "[T]he required intent to hinder, delay or defraud is the debtor's; no collusion with the transferee is necessary." *In re Nat'l Audit Def. Network,* 367 B.R. at 221. It was undisputed that the transfers to the Castaldis were Debtors' property, and that they were made within two or four years of the petition date. The only dispute was whether Debtors made the transfers with actual intent to hinder, delay, or defraud a creditor.

Trustee asserted that Debtors were running a Ponzi scheme with their sports betting enterprise and that the transfers to the Castaldis were made in furtherance of that scheme. The Ninth Circuit has defined a Ponzi scheme as:

an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to the previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists.

*Hayes v. Palm Seedlings Partners-A, L.P. (In re Agric. Rsch. & Tech. Grp., Inc.),* 916

F.2d 528, 531 (9th Cir. 1990).

"Transfers made in furtherance of Ponzi schemes have achieved a special status in fraudulent transfer law." *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen),* 199 B.R. 709, 717 (9th Cir. BAP 1996). The mere existence of a Ponzi scheme is sufficient to establish the debtor's actual intent to hinder, delay, or defraud creditors under § 548(a)(1) or a state's equivalent fraudulent transfer statute. *Johnson v. Neilson (In re Slatkin),* 525 F.3d 805, 814 (9th Cir. 2008); *Barclay v. Mackenzie (In re AFI Holding, Inc.),* 525 F.3d 700, 704 (9th Cir. 2008); *Hayes,* 916 F.2d at 534-35; *In re Cohen,* 199 B.R. at 717. And once the existence of a Ponzi scheme is established, payments received by the transferee that exceed his or her initial investment are deemed to be fraudulent transfers as a matter of law. *See In re Slatkin,* 525 F.3d at 814. That is because the source of the so-called "profits" received by the transferee is "a theft by the debtor from other investors." *Id.* at 815 (cleaned up).

In support of his position that Debtors were running a Ponzi scheme, Trustee set forth uncontroverted evidence from accounting experts Russell and Ross that only 15% to 20% of the nearly $30 million Debtors raised from investors may have been used for betting activities on their behalf, and that the vast majority of the money paid to investors was in Ponzi payments. Other than denying that Debtors were running a Ponzi scheme, the Castaldis did not present an affidavit or any other admissible evidence specifically challenging any of the facts Trustee set forth supporting a Ponzi scheme. Trustee's evidence demonstrated the existence of a Ponzi scheme, and the Castaldis

16

failed to produce any specific evidence, through affidavits or admissible discovery materials, that created a genuine issue of material fact as to that issue.

On appeal, the Castaldis challenge some of the evidence Trustee submitted to prove that Debtors were running a Ponzi scheme, and they argue that the bankruptcy court erred in determining that this evidence was uncontroverted or supportive of a Ponzi scheme. First, they challenge the evidence Trustee submitted from the SEC. Though difficult to decipher, the Castaldis appear to argue that the SEC's failure to make Russell available for deposition or provide them with any documents created a genuine dispute of material fact that Debtors were running a Ponzi scheme. For starters, the Castaldis did not raise this argument in opposition to the MSJ. Further, their argument is not well-taken. The Castaldis never made a request to the SEC that Russell be made available for deposition or that the SEC turn over documents supporting Russell's opinion.

Second, the Castaldis challenge the SEC default judgments and argue that the bankruptcy court erred in finding that they supported Trustee's claim Debtors were running a Ponzi scheme, when default judgments lack res judicata effect. The Castaldis are unable to cite in the record where the court made this finding because they failed to submit a transcript of the court's oral ruling. In any event, the SEC default judgments were only some of the evidence supporting Trustee's claim of a Ponzi scheme. Trustee's accountant, Ross, reviewed the SEC's evidence and conducted his own investigation and

17

also concluded that Debtors were running a Ponzi scheme. The Castaldis did not challenge Ross's opinion or offer anything to the contrary.

Next, the Castaldis argue that the bankruptcy court erred in finding that Thomas's declaration submitted in support of their opposition to the MSJ was not credible. Again, the Castaldis are unable to cite where in the record the court made this purported finding because they failed to submit a transcript of the court's oral ruling. We assume what they mean is that the court determined that Thomas's declaration failed to raise a genuine issue of material fact. Thomas stated that the Merry Christmas check to Mr. Castaldi was for the repayment of two $10,000 loans the Castaldis made to him in 2015. Thomas also stated that the Castaldis returned the remainder of funds from the cashed checks to Debtors, which was undisputed. We agree that the Thomas declaration failed to raise a genuine issue of material fact. Whether the Merry Christmas check was for the repayment of a loan or a gift to the Castaldis, stolen investor funds were used to pay it. Thus, its fraudulent nature remained the same.

The Castaldis next argue that the bankruptcy court erred in determining that they were a "net winner" when it determined in another case involving a check casher for Debtors that she was not. Again, the Castaldis are unable to cite where in the record the court made this purported finding because they failed to submit a transcript of the court's oral ruling. Further, the outcome in another individual's case does not compel the same outcome in this one, nor have the Castaldis explained why it should. Finally, the term "net winner"

18

refers to a "lucky" Ponzi investor who received more in Ponzi payments than what was initially invested. *In re Slatkin*, 525 F.3d at 815 (citing *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995)). By their own admission, the Castaldis were not investors; they were independent contractors who cashed checks for Debtors.

Next, the Castaldis argue that the bankruptcy court erred in ordering settlements and judgments in all of Trustee's adversary proceedings against transferees of Debtors' property because he failed to present any evidence of a Ponzi scheme. Not only do the Castaldis lack standing to challenge orders entered in other parties' cases, their argument lacks merit. As noted above, Trustee provided a plethora of evidence demonstrating that Debtors were running a Ponzi scheme.

Finally, the Castaldis argue that Trustee and his counsel should be referred to the "Law Board" and possibly disbarred for lying to the bankruptcy court, running a sham, and shaking down defendants, when they knew they had no evidence of a Ponzi scheme and could not win at trial. Vitriol aside, Trustee and his counsel had evidence of a Ponzi scheme and proved its existence on summary judgment, thereby eliminating the need for a trial.

There are defenses to an actual fraudulent transfer under both § 548 and Nevada law. Section 548(c) and NRS § 112.220(1) provide that such transfers are not avoidable against a transferee who took in good faith and for value or reasonably equivalent value. § 548(c) (value); § NRS 112.220(1) (reasonably equivalent value). Once Trustee met his burden of showing that the transfers

19

to the Castaldis were made with the requisite intent, it was the Castaldis' burden to prove the existence of good faith and, as applicable, value and reasonably equivalent value. *In re Nat'l Audit Def. Network,* 367 B.R. at 224.

The Castaldis do not raise this issue on appeal. We can only assume the bankruptcy court determined that they failed to show there were any triable issues of fact regarding value or reasonably equivalent value or their good faith for the transfers. Even if the Castaldis could show good faith, they cannot show value or reasonably equivalent value. Transfers from a Ponzi scheme given in exchange for value, where that value is solely participation in or continuation of a Ponzi scheme, are made without reasonably equivalent value required to defend against liability. *Hoffman v. Markowitz,* 746 F. App'x 641, 642 (9th Cir. 2018) (holding that referral fees paid in exchange for referring others to the Ponzi scheme do not constitute "reasonably equivalent value") (citing *Warfield v. Byron,* 436 F.3d 551, 555, 560 (5th Cir. 2006)).

Although the Castaldis were not brokers and did not solicit investors, their check cashing services enabled and perpetuated Debtors' fraudulent scheme for the last 18 months of the operation by converting traceable bank funds into untraceable cash, and that cash has never been accounted for. The $50 they kept from every cashed check for gas money is analogous to fees paid for a referral service that gives no reasonably equivalent value in a Ponzi scheme. The same is true for the cash they returned to Debtors, which the Castaldis do not dispute on appeal. Lastly, even assuming that the Merry Christmas check was a repayment of loans the Castaldis made to Thomas, it

20

was drawn against one of the Debtor entity accounts and signed by Becker. Satisfaction of Thomas's personal debts from non-personal funds gives no conceivable reasonably equivalent value to Debtors.

There were no triable issues of fact that: (1) Debtors operated a Ponzi scheme; (2) the transfers were made to the Castaldis with actual intent to hinder, delay, or defraud Debtors' creditors in furtherance of that scheme and were avoidable under the Bankruptcy Code and Nevada law; and (3) the Castaldis had no defense to avoidance of the transfers. Accordingly, the bankruptcy court did not err in granting Trustee summary judgment.

## CONCLUSION

For the reasons stated above, we AFFIRM.