Claire Kenneth DE BARDOSSY, Plaintiff,

v.

Sandor PUSKI and Corvin Hungarian Books, Defendants.

No. 90 Civ. 3559 (JSM).

United States District Court, S.D. New York.

April 24, 1991.

---

**1240**

Nicholas R. Doman, New York City, for plaintiff.

Zoltan Hankovszky, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

Plaintiff Claire Kenneth De Bardossy, a Hungarian born writer of romance novels, commenced this copyright action against Sandor Puski and Corvin Hungarian Books to recover damages for and to enjoin the defendants' allegedly unauthorized publication of plaintiff's novels in Hungary. Defendants interposed a counterclaim which sought a declaration that they have the right to publish plaintiff's works in the Hungarian language in any locale in the world.

The matter is now before the Court on the parties' cross-motions for summary judgment. For the reasons discussed below, the Court finds that it lacks subject matter jurisdiction over plaintiff's claims. Accordingly, both plaintiff's complaint and defendants' counterclaim are dismissed.

## BACKGROUND

According to the complaint, plaintiff was born and raised in Hungary and lived there until 1956 with her husband, Paul De Bardossy, and their son. Paul De Bardossy's uncle, Laszlo Bardossy, was the Prime Minister of Hungary in 1941 and 1942. During that time, Laszlo Bardossy declared war on the Soviet Union, was arrested in 1945 and was executed in 1946.

Given the Communist takeover of Hungary and the familial connections between plaintiff and Laszlo Bardossy, plaintiff was forced to adopt a non de plume—Claire Kenneth—in order to have her books published in Communist Hungary.

In 1946 and 1947, plaintiff wrote two highly successful romance novels entitled "Night in Cairo" and "Rendezvous in Rome" (respectively the "Cairo book" and the "Rome book"). Sometime thereafter, plaintiff's true identity was discovered. Accused of being a "class enemy," plaintiff's works were banned and she was deported to an undeveloped area and drafted to do forced labor.

During the turmoil created by the Hungarian Revolution of 1956, plaintiff, her son and her husband, who himself had been imprisoned for three years for attempting to enter Austria, escaped from Hungary and settled in the United States.

Plaintiff resumed her writing after arriving in New York. Ultimately, plaintiff met defendant Sandor Puski sometime in the 1970's. Puski, also Hungarian born, states that he was a book publisher in Hungary from 1938 until 1950 when the Hungarian government nationalized his business and forced the defendant to seek other employment.

In 1970, Puski and his wife left Hungary and joined their sons who had previously settled in the United States. Puski eventually purchased the Corvin Book Store, a Hungarian language book store located on Second Avenue in New York City. Puski was also publishing books in the Hungarian language through May Publishing Company.

Plaintiff claims that in the 1970's, Puski approached plaintiff and requested that he be permitted to publish her books. Plaintiff further claims that Puski told her that

he was a lawyer and that he would prepare the contracts which would enable Puski to publish plaintiff's books in New York in the Hungarian language.[1] Plaintiff states that during this time, she had no separate legal representation.

Eight letter agreements were signed by the parties between 1976 and 1987. These agreements cover all of plaintiff's works with the exceptions of the Cairo and Rome books. Although each letter agreement differs to some insignificant degree, the agreements provide in relevant part as follows:

> You [plaintiff] sold and I [Puski–Corvin and/or Puski] purchased the publishing rights in the Hungarian language of your books entitled.... for....
>
> I will publish the books ... under the May Publishing Co. publishing series.
>
> In the event of my death, all my rights and obligations hereunder are my wife's and in the event of her death, are my estate's, but we may assign these rights and obligations to another person or entity.
>
> With the exception of the right to publish in the Hungarian language you retain all rights as author, including rights of translation, dramatization and screenplays.
>
> In the event the above or any further edition is sold out and not republished by me within two years, the Hungarian language publishing right reverts to you without any compensation.

The letter agreements further provide for a one-time royalty payment to plaintiff ranging from $2,000 to $6,750.00 per book. Eventually, all thirteen of plaintiff's books, including the Cairo and Rome books not covered by the letter agreements, were published and sold in the United States under the May Publishing imprint.[2]

With respect to the Cairo and Rome books, defendants concede that there is no written agreement between Puski or his corporate entities and plaintiff. Defendants, however, claim that Puski acquired the rights to publish these two books in 1983 when he purchased the stock and existing publishing rights of Pilvax Publishing Corp. from its sole proprietor Dezso Gero in 1983. *See* Puski Aff., ¶ 16 and Rule 3(g) Statement, ¶ 5.

Puski's contention is supported by a letter, dated July 6, 1988, from plaintiff to Laszlo Rapcsanyi in Hungary, wherein plaintiff states that:

> When we arrived in New York penniless and without any sponsors and Pali was cleaning at night at Rockefeller Center and I was a manager in Altman's Fifth Avenue Fur Salon, Pali met this Udvardy, who had a bookstore on First Avenue. *To this man, he sold lock, stock and barrel, the Hungarian rights to the Cairo and Rome books.* The guy became rich from this, even purchased a motel in New Jersey and two apartment buildings on Bruckner Boulevard. Then he sold it to the Roth and Son Company which continued to print them without end, flooding the Hungarian readership of five continents. Finally, *they sold it to a publisher named Pilvax,* who published the books of Peter Halasz, Svetlana Stalin's diary and Exodous. He was a crook, finally he died and *his widow sold the rights to Puski.*
>
> This is where we are presently. *Puski is an extremely honest and correct per-*

---

**1.** Puski is a 1935 law graduate of the University of Budapest. He claims, however, that he never was employed as an intern in a law office, a prerequisite to being licensed as an attorney in Hungary, and that he never practiced law anywhere. In addition, Puski rejects plaintiff's claim that he initiated the negotiations and claims that the contracts were negotiated at arms-length with input from plaintiff. Defendants also point out that, prior to signing the letter agreements, certain of plaintiff's books had been published in the United States by other publishers. In fact, defendant states that the letter agreements were based upon and con-

tained terms also contained in agreements plaintiff had signed with other publishers. These additional allegations, although perhaps relevant to the merits of the parties' claims, play no role in the subject matter jurisdiction question.

**2.** All told, defendants paid plaintiff $39,750.00 in the 1976–1987 period for the right to publish plaintiff's eleven books. It appears that defendants published 42,529 copies of these books at $15.00 per copy.

*son. He publishes all thirteen of my Hungarian books. They are bestsellers on five continents and they continue to appear edition by edition. I receive my author's fee in lump sum. I don't like accounting, and to concern myself how many thousands of copies were printed and sold.*

*See* Puski Aff., Exhibit D.[3]

The story now shifts to the East Europe. In 1989, Janos Kadar, the head of the Communist Hungarian government since the Soviet Union crushed the 1956 uprising, was forced to retire and the country joined the rest of Eastern Europe in attempting to democratize the economy and political process. Defendants, apparently sensing a liberalization of society, one free of censorship, proceeded to contract with a state-owned publisher in Budapest to have plaintiff's books published in Hungary.

Contracts, dated June 14, 1989, for the publication of the Cairo and Rome books were executed between Puski–Corvin/Hungarian Books, Records, Tapes, as Proprietor, and Arkadia Publishers, a subsidiary of Europa Publishers. These contracts call for the publication of 200,000 copies of each book, a sharp contrast to the 42,529 copies of plaintiff's books that were sold in the United States over a twelve year period.[4]

The inside page of the Cairo book provides:

COPYRIGHT by Puski Sandor 1989

After being confronted by plaintiff, Puski claimed that this copyright notice was a mistake and he promised that in subsequent editions plaintiff would be listed as the copyright owner.[5]

On September 26, 1989, defendants contracted with Europa Publishers for three additional books authored by the plaintiff.[6] No further books, however, were published by Europa after plaintiff's attorney's advised Europa in the fall of 1989 that Claire Kenneth owned the copyrights to the five books that Europa had published.

Sometime in 1988 or 1989, Puski moved back to Hungary and started Puski Kiado (Publishers), a book publishing company. The majority of shares in Puski Kiado is owned by defendant Puski Corvin Hungarian Books and Puski is the company's managing director. The defendants, Puski and Puski Corvin Hungarian Books, thereafter proceeded to contract with their Hungarian entity for the publication of additional books written by the plaintiff. Defendant Puski signed the contracts on behalf of the defendants and his son signed for Puski Kiado. Approximately 883,742 copies of the three books were published as of October 17, 1990 with defendants paying themselves a royalty of 6,894,143, or $114,902.00 at the current exchange rate.

Although at that time, Puski had not yet published plaintiff's remaining books, he acknowledged at his deposition that he intended to do so. Hearing this, plaintiff, in the fall of 1990, contracted to have these last five novels published by Magyar Vilag in Hungary. Plaintiff claims that Puski, upon returning to Hungary after being deposed in the United States, learned of Magyar Vilag's intentions and, as result, proceeded to have Puski Kiado publish these same books.

As a result of defendants' actions as described above, plaintiff seeks an order enjoining defendants from infringing plain-

---

**3.** Plaintiff also appears to have admitted the transfers at her deposition. Moreover, attached as Exhibit E to Puski's affidavit is an April 9, 1975 letter agreement between plaintiff and Pilvax which provides that "Of your Randevu Romaban" [the Rome book] entitled work, *to which you [plaintiff] no longer own the Hungarian language rights,* you will receive 25 complementary copies ..."

**4.** It appears that Puski received at least $44,-936.00 in royalties for the licensing of these two books.

**5.** It appears that Puski has complied with this promise. Puski does not dispute that plaintiff holds the copyright in all thirteen of her books. He asserts, however, that he owns the Hungarian language rights in these books.

**6.** Although the contracts provide for the publication of 250,000 copies of each book, an additional 80,000 of each were published as of October 17, 1990. Defendant Puski admits receiving 5,838,300 forprints, which plaintiff claims converts to $97,300.00, for the licensing of these three books.

tiff's copyrights, damages flowing from the publication in Hungary of plaintiff's books and an accounting of all profits defendants have derived from the publication of plaintiff's books in Hungary. Defendants seek an order declaring that, pursuant to the letter agreements and their purchase of the Pilvax inventory, they own the right to publish worldwide plaintiff's works in the Hungarian language.

## DISCUSSION

### 1. Jurisdiction under the Copyright Act

At the outset, the Court must consider defendants' claim that the Court lacks subject matter jurisdiction under 28 U.S.C. § 1338(a) since subject matter jurisdiction is a constitutional prerequisite to a federal court's power to act. *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 72 (2d Cir.1988).

Defendants argue that jurisdiction is lacking in the present case because the United States Copyright laws generally do not have extraterritorial application and because the exceptions to this principle are inapplicable herein.

In *Update Art*, the Second Circuit succinctly set forth, as follows, both the general principle and the exception to extraterritorial jurisdictions:

> [i]t is generally well established that copyright laws do not have extraterritorial application. There is an exception—when the type of infringement permits further reproduction abroad—such as the unauthorized manufacture of copyrighted material in the United States.

*Update Art, Inc., supra*, 843 F.2d at 72. *See also Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir.1981); *Robert Stigwood Group, Ltd. v. O'Reilly*, 530 F.2d 1096, 1100–1101 (2d Cir.), *cert.*

*denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); *Gaste v. Kaiserman*, 683 F.Supp. 63 (S.D.N.Y.), *aff'd*, 863 F.2d 1061 (2d Cir.1988); *Ahbez v. Edwin H. Morris & Co.*, 548 F.Supp. 664, 667 (S.D.N.Y.1982).

In *Update Art*, an Israeli newspaper included within its weekend edition a full-page, full-color reproduction of a "Ronbo" poster, a takeoff from the Rambo character depicting President Reagan's head superimposed over Rambo's body. Plaintiff owned exclusive contract rights for the worldwide publication and distribution of Ronbo art work. The Second Circuit stated that the applicability of American copyright laws over the Israeli newspaper depended upon "the occurrence of a predicate act in the United States." *Id.* Continuing, the Court reasoned that if the illegal reproduction occurs in the United States and then is exported abroad, subject matter jurisdiction is proper. *Id.*

■ Thus, it appears that jurisdiction would be proper in the United States in the present case if plaintiff can show that an infringing act occurred in the United States and that this act has led to further infringement abroad.[7]

■ Plaintiff argues that subject matter is proper because (1) defendants were authorized to publish the books in the United States through agreements negotiated and executed in New York between plaintiff and Puski, (2) all of the books were first published in the United States by an American publisher and (3) defendants authorized the removal to and foreign publication of plaintiff's books through the letter agreements.

Although none of these three claimed bases for jurisdiction involve any infringing act within the United States,[8] plaintiff ar-

---

7. *See also P & D International v. Halsey Pub. Co.*, 672 F.Supp. 1429, 1432 (S.D.Fla.1987) (to the extent that part of an "act" of infringement occurs within this country, although such act be completed in a foreign jurisdiction, those who contributed to the act within the United States may be liable under the United States copyright law), *citing*, 3 M. Nimmer, *Nimmer on Copyright*, § 17.02 at 17–5.

8. *See Ahbez, supra*, 548 F.Supp. at 667 ("Ahbez has failed to allege any infringing acts occurring in the United States. Absent such a showing, Ahbez cannot avoid application of the general rule that the copyright laws do not have extraterritorial operation"); *Fantasy, Inc. v. Fogerty*, 664 F.Supp. 1345, 1351 (N.D.Cal.1987) ("no cause of action exists for 'infringing actions which take place entirely outside the United

gues that the decisions of the Ninth Circuit in *Peter Starr Production Co. v. Twin Continental Films,* 783 F.2d 1440, 1442 (9th Cir.1986) and the district court in *Thomas v. Pansy Ellen Products, Inc.,* 672 F.Supp. 237, 241 (W.D.N.C.1987) support extraterritorial jurisdiction of her claims. This Court disagrees.

In *Peter Starr,* plaintiff authorized a business acquaintance to explore the possibilities of marketing his motion picture abroad but specified that the agent had no binding authority. After plaintiff rejected a number of offers, the agent improperly entered into a license agreement purporting to authorize the use of the copyright work abroad. The agreement, while negotiated in France, was executed in the United States. The Court upheld subject matter jurisdiction based upon the fact that the contract authorizing the infringement was executed in the United States. In so holding, the Court reasoned that since the Copyright Act conferred on the owner of the copyright "the exclusive rights ... to authorize" the use of his work, the improper authorization which occurred in the United States itself constituted a violation of the Copyright Act.

Similarly, in *Thomas,* defendant's agent sent a letter from the United States to a Taiwan manufacturer authorizing the manufacturer to reproduce the copyrighted work in Taiwan. The Court, relying upon

the *Peter Starr* decision, held that "[t]he authorization thus occurred here ..." 672 F.Supp. at 241.[9]

Unlike the above cases upon which plaintiff relies, there was no unauthorized activity in the United States in the present action. Specifically, plaintiff does not allege that defendants' publication of Hungarian language editions of her books in the United States violated the Copyright Act since this is exactly what was called for under the letter agreements.[10]

Moreover, plaintiff does not—and, indeed, cannot—claim that the mere act of taking books legally produced in the United States to Hungary violated the Copyright Act. The same holds true for the transportation to Hungary of the letter agreements. And the letter agreements, while undoubtedly executed in the United States, were not the documents which constituted the alleged infringing authorization. Finally, and most significantly, the contracts authorizing the alleged improper use of plaintiff's copyright in Hungary were negotiated in Hungary and not in the United States.

Nevertheless, the Hungarian contracts, plaintiff claims, were induced by the letter agreements, since they evidenced the defendants' apparent authority to publish the works in the Hungarian language. As a result, plaintiff argues that the letter

---

States' "); *cf. P & D International,* 672 F.Supp. at 1433 (although the allegedly infringing film was shown on cruises abroad, defendant admitted copying, in Florida, the copyrighted film upon which the infringing work was based).

9. *See also Fogerty, supra,* 664 F.Supp. at 1352 ("if any infringing act (i.e. an illegal authorization) occurs in the United States, then the court may impose a constructive trust upon the extraterritorial profits derived from that infringing act"; plaintiff's motion for summary judgment denied since it was unclear if defendant authorized within the United States the reproduction and sale of the performances abroad).

10. Plaintiff appears at times to argue that she never authorized the defendants to publish the Cairo and Rome books in the United States. If this was so, the improper publication of these works in the United States would certainly be an infringing act that could lead to continued

infringement abroad. However, the Court finds that plaintiff's July 8, 1988 letter constitutes an admission that she, indeed, did grant a Hungarian language license in these books and that defendants subsequently acquired the license.

In response, plaintiff argues that the letter only represents what she was told and not the true state of affairs. However, once a motion for summary judgment is properly made, the burden shifts to the non-moving party which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), *quoting,* Fed.R. Civ.P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). Under this standard, the Court finds that plaintiff has failed to satisfy her burden to rebut defendants' proof.

agreements were "links in the chain of links in the infringement."

This "link in the chain" argument, however, was rejected by the Second Circuit in *Robert Stigwood Group, Ltd. v. O'Reilly*, 530 F.2d 1096, 1100–1101 (2d Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). In that action, defendants, Roman Catholic priests, infringed plaintiffs' copyright by performing the rock opera "Jesus Christ Superstar" without authorization. Each party took exception to the district court's decision on damages with plaintiffs contending that the defendants' Canadian performances should have been included in the damage calculation. Plaintiffs argued that prior to each performance, the defendants assembled and arranged in the United States all the necessary elements for the performance and then simply traveled to Canada. Thus, plaintiffs argued that the acts in the United States constituted "an integral part of the Canadian performances ..." 530 F.2d at 1100. The Court, however, found that the steps taken by the defendants in the United States were "certainly not the 'manufacture' of anything, nor were the performances 'records' from which the work could be reproduced." *Id.* at 1101. The Court, thus, held that "[i]t is only when the type of infringement permits further reproduction abroad that its exploitation abroad becomes the subject of a constructive trust." *Id., citing,* 2 Nimmer on Copyright § 156.

Having failed to produce any predicate act of infringement in the United States or even a domestic improper authorization, the Court finds that it lacks subject matter jurisdiction under the Copyright Act to entertain plaintiff's claims.

## 2. *Jurisdiction under the Universal Copyright Convention*

■ Although not pled in the complaint, plaintiff now alternatively argues that the Court has jurisdiction over this matter under the Universal Copyright Convention (the "Convention").[11] The Convention, as reprinted in Nimmer on Copyright, Appendix 25 (1987), provides that:

> Published works of nationals of any Contracting State and works first published in that State shall enjoy in each other Contracting State the same protection as that other State accords works of its nationals first published in its own territory, as well as the protections granted by this Convention.

Plaintiff argues that, under the Convention, if the infringements took place in and entitled plaintiff to sue in Hungary, jurisdiction would also be conferred on an American court. This is not so.

The Convention does not expand a member state's copyright laws extraterritorially. Instead, the Convention simply provides that a contracting state must accord the same copyright protection to a work produced or created abroad but infringed in the contracting state that it would to a domestic work.[12] For this reason, the Court holds that there is no subject matter jurisdiction over plaintiff's claims under the Convention.

---

**11.** It is noteworthy that in only two of the cases cited in the preceding section of this opinion which discuss the extraterritorial effect of the Copyright Act did the question of the Convention even arise. In these two cases, the courts did not address the issue since they found jurisdiction proper under the Copyright Act. *Peter Starr*, 783 F.2d at 1443, n. 3; *P & D International*, 672 F.Supp. at 1433.

**12.** *See Beechwood Music Corp. v. Vee Jay Records, Inc.*, 226 F.Supp. 8 (S.D.N.Y.1964), *aff'd*, 328 F.2d 728 (2d Cir.1964):
> [t]he essential feature of the Convention is nondiscrimination by member nations; a member nation must accord works protected

by the Convention the same protection that it grants to domestic works.... The Convention deals with reciprocity in the registration and exploitation of foreign created copyrights and *does not provide for the exportation or extraterritorial application of the copyright laws of member nations.*
*Cf. Grove Press, Inc. v. Greenleaf Pub. Co.*, 247 F.Supp. 518 (E.D.N.Y.1965) ("As the result of United States ratification of the Universal Copyright Convention in 1955, foreign authors of works first published abroad in the English language may secure copyright protection without complying with the manufacturing and ad interim provisions").

## CONCLUSION

For the reasons discussed above, the Court finds that it lacks subject matter jurisdiction over plaintiff's complaint. Accordingly, both the complaint and defendants' counterclaim are dismissed.

SO ORDERED.