**CYBERMEDIA, INC., Plaintiff,**

v.

**SYMANTEC CORPORATION, et al., Defendants.**

No. C–98–20113–JF(EAI).

United States District Court, N.D. California, San Jose Division.

Sept. 4, 1998.

**1072**

David H. Kramer, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Plaintiff CyberMedia, Inc.

Stanley Young, Heller Ehrman White & McAuliffe, Palo Alto, CA, for Defendant Symantec Corporation.

Paul F. Wellborn, III, Arnall Golden & Gregory, Atlanta, GA, Karen P. Kimmey, Farella Braun & Martel, LLP, San Francisco, CA, for Defendants ZebraSoft, Inc., Timothy O'Pry, Thomas Lynch and Snehal Vashi.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

FOGEL, District Judge.

Plaintiff's motion for preliminary injunction was heard on July 13, 1998 and again, following supplemental briefing, on August 28, 1998. For the reasons discussed below, Plaintiff's motion is granted.

## I. BACKGROUND

Plaintiff CyberMedia, Inc. ("CyberMedia") is a computer software manufacturer. Its products include a computer cleanup program called UnInstaller, which allows users to remove unwanted applications, files and other clutter from their computers.

Defendant Symantec Corporation ("Symantec") also manufactures computer software. Among its products is a program called Norton Uninstall Deluxe ("NUD"), a computer cleanup program marketed in direct competition with CyberMedia's UnInstaller. Symantec acquired NUD from co-defendant ZebraSoft, Inc. ("ZebraSoft"), a software development company which created NUD for Symantec pursuant to contract.

This action arises from CyberMedia's allegations that Symantec's NUD product infringes CyberMedia's copyright in its UnInstaller product. In particular, CyberMedia alleges that the ZebraSoft employees who created NUD previously worked on UnInstaller, and that these ZebraSoft employees simply lifted blocks of source code from UnInstaller and used that code to create NUD. CyberMedia filed suit on February 4, 1998, asserting claims for copyright infringement, misappropriation of trade secrets and unfair

competition against Symantec, ZebraSoft and three of ZebraSoft's officers.[1]

On May 15, 1998, CyberMedia filed the present motion for preliminary injunction. CyberMedia seeks an order: (1) prohibiting Defendants from manufacturing or distributing any infringing version of NUD or any infringing works derived therefrom; (2) requiring Defendants to recall NUD from all distributors; (3) requiring Defendants to deliver all originals and copies of NUD to CyberMedia for impoundment in a bonded warehouse during the pendency of this action; (4) requiring Defendants to return to CyberMedia all copies of UnInstaller source code, except code provided to Defendants' counsel in connection with this litigation; and (5) requiring Defendants to file affidavits detailing the manner in which they have complied with the order granting preliminary injunction. Symantec and ZebraSoft oppose the motion.

## II. DISCUSSION[2]

In this judicial circuit, a party seeking a preliminary injunction must show either (1) a likelihood of success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor. *See Roe v. Anderson*, 134 F.3d 1400, 1401–02 (9th Cir.1998); *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 523 (9th Cir.1984). These formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *See Roe*, 134 F.3d at 1402.

Under the first formulation set forth above, CyberMedia may obtain a preliminary injunction if it demonstrates a likelihood of success on the merits and the possibility of irreparable injury.

## A. Likelihood Of Success On The Merits

In order to prevail on its copyright infringement claim, CyberMedia must prove: (1) ownership of a valid copyright in UnInstaller and (2) copying of expression protected by that copyright. *See Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir.1995).

## 1. Ownership Of Copyright

 As proof that it owns a valid copyright in UnInstaller, CyberMedia offers its copyright registration for the program, dated November 26, 1997. This registration creates a rebuttable presumption that CyberMedia's copyright in the program is valid.[3] *See* 17 U.S.C. § 410(c); *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998); *Apple Computer*, 725 F.2d at 523. Defendants may rebut this presumption by introducing "some evidence or proof" that CyberMedia's copyright in the work is not valid. *See Entertainment Research Group*, 122 F.3d at 1217. If Defendants rebut the presumption, the burden shifts back to CyberMedia to demonstrate

1. For the sake of convenience, ZebraSoft and its officers will be referred to collectively as "ZebraSoft."

2. Much of the material filed in connection with this motion contains proprietary or other confidential information and therefore was filed pursuant to a stipulated protective order. Accordingly, the Court's discussion of the facts and evidence necessarily is more limited than it would be under other circumstances.

3. Pursuant to 17 U.S.C. § 410(c), a certificate of a copyright registration made before or within five years after first publication of the work constitutes *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. Here, CyberMedia's copyright registration

indicates that UnInstaller 4 first was published in September 1996, less than five years before CyberMedia's registration of the copyright.

Symantec argues that CyberMedia's copyright registration form is defective because CyberMedia failed to indicate that UnInstaller was a work made for hire. This argument is without merit. The administrative staff manuals maintained by the Copyright Office for guidance of its staff in making registrations and recording documents provide that when an application names a corporation as the author but does not indicate whether the work to be copyrighted was made for hire the application will be accepted upon the assumption that the work was made for hire. *See Compendium of Copyright Practice* § 615.04(d)(1); 37 C.F.R. § 201.2(b)(7)(authorizing *Compendium* ).

the validity of its copyright. *See id.* at 1218. The Court concludes that, for purposes of the present motion, CyberMedia may meet this burden by showing that it is likely to succeed on the merits of its claim that it owns a valid copyright in UnInstaller.

Defendants contend that a plaintiff seeking a preliminary injunction in a copyright action must show more than a likelihood of success on the merits regarding its ownership of a valid copyright; instead, they argue, such a plaintiff must show even at this preliminary stage an absence of a genuine issue of fact regarding this element of its claim. Neither of the cases cited by Defendants, nor any other authority of which the Court is aware, supports this proposition.

In *Siebersma v. Van de Berg,* 64 F.3d 448 (8th Cir.1995), the Court of Appeals reversed the district court's order granting summary judgment on the issue of copyright ownership and in so doing also dissolved the preliminary injunction which had been issued on the basis of the summary judgment ruling. In *Video Trip Corp. v. Lightning Video, Inc.,* 866 F.2d 50 (2d Cir.1989), the Court of Appeals affirmed the district court's denial of an application for preliminary injunction, holding that factual issues regarding ownership of the copyright in question in that case precluded a determination that the applicant had demonstrated a probability of success on the merits. Nothing in these cases suggests that a heightened standard applies to applications for preliminary injunction in copyright actions.[4]

■ Defendants attempt to rebut the presumption of validity by contending that CyberMedia acquired UnInstaller by means of a fraudulent transfer which should be set aside. Under California's version of the Uniform Fraudulent Transfer Act ("UFTA"), a transfer is fraudulent if it is made "[w]ith actual intent to hinder, delay, or defraud"

any creditor of the transferor. Cal. Civil Code § 3439.04(a). A defrauded creditor may seek to have such a transfer voided to the extent necessary to satisfy the creditor's claim. *See* Cal. Civil Code § 3439.07(a)(1). However, a transfer made fraudulent by the transferor's intent may not be voided against a person "who took in good faith and for a reasonably equivalent value." Cal. Civil Code § 3439.08(a).

CyberMedia acquired UnInstaller from a company called Luckman Interactive, Inc. ("Luckman") in April 1997. Luckman had acquired UnInstaller during a 1996 merger with UnInstaller's previous owner, a company called MicroHelp, Inc. ("MicroHelp").

Defendants contend that Luckman's sale of UnInstaller to CyberMedia was intended to "hinder, delay, or defraud" MicroHelp's shareholders,[5] to whom Luckman owed millions of dollars under the merger agreement. In support of this contention, Defendants point to evidence that Luckman failed to pay the MicroHelp shareholders $5 million of the $17.5 million owed them under the merger agreement.[6]

This evidence is insufficient to rebut the presumption that CyberMedia's copyright is valid. At most, the proffered evidence demonstrates that Luckman may be in breach of the merger agreement and that CyberMedia was aware of ongoing disputes between Luckman and the MicroHelp shareholders at the time it purchased UnInstaller. The fact that Luckman may have defaulted on its payments under the merger agreement does not constitute evidence that the purpose of the UnInstaller sale was to defraud the MicroHelp shareholders. Although Defendants contend that Luckman's fraudulent intent is apparent from the fact that it sheltered the bulk of the UnInstaller proceeds by assigning the proceeds to its wholly owned subsidiary, a "sham" corporation called Line Communications, Inc. ("Line"), in return for

---

4. The Court notes that even if the heightened standard suggested by Defendants were applicable, CyberMedia still would be entitled to relief, because, as is discussed below, the evidence does not disclose any genuine issues of fact regarding CyberMedia's ownership of a valid copyright in UnInstaller.

5. Some of these same MicroHelp shareholders subsequently founded Defendant ZebraSoft and are sued as individual defendants in this action.

6. The MicroHelp shareholder's claims for breach of the merger agreement currently are being litigated in the Los Angeles County Superior Court.

worthless Line stock, Defendants fail to refer the Court to any evidence regarding the sham nature of Line or the worthlessness of its stock. Moreover, even if Defendants' evidence were probative of fraudulent intent on the part of Luckman, Defendants offer no proof that CyberMedia acted other than in good faith or failed to pay a reasonably equivalent value for UnInstaller.

There is a surprising dearth of authority regarding the standard applicable to the good faith requirement under California's version of the UFTA. The Court is aware of only two decisions addressing the issue, each of which defines the standard somewhat differently. In *Lewis v. Superior Court*, 30 Cal.App.4th 1850, 37 Cal.Rptr.2d 63 (1994), the court held that a transferee lacks good faith only if he or she "collude[s] with the debtor or otherwise actively participate[s] in the fraudulent scheme of the debtor." *Lewis v. Superior Court*, 30 Cal.App.4th 1850, 1858–59, 37 Cal.Rptr.2d 63 (1994). In *Cohen v. Pomona Valley Imports, Inc.*, 199 B.R. 709 (9th Cir.BAP 1996), the court stated that a transferee lacks good faith if he or she is "possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction." *Cohen v. Pomona Valley Imports, Inc.*, 199 B.R. 709, 719 (9th Cir.BAP 1996).

■ The Court believes the proper standard to be a combination of these two definitions. The Legislative Committee Comment to California Civil Code § 3439.08 states that a transferee acts without good faith if he or she "collude[s] with the debtor or otherwise actively participate[s] in the fraudulent scheme of the debtor." Cal. Civil Code § 3439.08, Comment (1). Clearly, then, the *Lewis* court was correct in holding that a transferee who colludes with the debtor or otherwise participates in the fraud lacks good

faith. However, the Legislative Committee Comment also states that "[k]nowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee." *Id.* This portion of the Comment supports the *Cohen* court's conclusion that a transferee's knowledge of facts evidencing fraud in the transfer may be sufficient to strip the transferee of good faith even in the absence of actual collusion or active participation. Accordingly, this Court holds that, for purposes of the UFTA, a transferee lacks good faith if he or she (1) colludes with the debtor or otherwise actively participates in the debtor's fraudulent scheme, or (2) has *actual knowledge* of facts which would suggest to a reasonable person that the transfer was fraudulent.[7]

In an effort to demonstrate that CyberMedia lacked good faith, Defendants show that CyberMedia's attorneys read news articles discussing claims asserted against Luckman by MicroHelp shareholders and others, including claims that Luckman refused to pay monies due under the merger agreement, before closing the UnInstaller sale. Defendants also point to a handwritten list headed "Why not do this?" written by CyberMedia's attorney, Hank Barry. Mr. Barry explained in his deposition that he routinely made a list of possible reasons not to conclude whatever deal he might be considering. One of the reasons Mr. Barry listed with respect to the UnInstaller transaction was that "Former s/h's [shareholders] of MH [MicroHelp] will sue Luckman and us [CyberMedia]—Fraud, will say we do not have title."

■ Defendants ask the Court to infer that, because CyberMedia's counsel knew about disputes between Luckman and MicroHelp shareholders (among others) and noted

---

7. Defendants argue that *Cohen* establishes a much broader "inquiry notice" standard, essentially contending that a transferee must inquire further into the transaction if he or she has knowledge that the transferor has been accused of wrongful conduct in any of the transferor's prior dealings. *Cohen* does not support such an interpretation. The *Cohen* court's statements regarding inquiry notice were based upon the same excerpt from the Legislative Committee Comment cited above, which refers to *"knowledge of*

*facts rendering the transfer voidable." Cohen*, 199 B.R. at 719 (emphasis added). Additionally, the standard argued by Defendants simply is not feasible in a commercial context. In our litigious society, commerce quickly would grind to a halt if every buyer had an affirmative duty to conduct an independent inquiry prior to purchasing an asset merely because the seller was involved in litigation or otherwise was accused of wrongdoing.

the risk that CyberMedia might be drawn into these disputes if it purchased UnInstaller, CyberMedia must have acted in bad faith when it consummated the UnInstaller deal. Such an inference cannot fairly be drawn.[8] A transferee's mere knowledge of the existence of creditors with claims against the transferor is not sufficient to show that the transferee had an intent to defraud the creditors. *See Kuhlman v. Pacific States S & L Co.*, 17 Cal.2d 820, 821, 112 P.2d 620 (1941); *Enos v. Picacho Gold Mining Co.*, 56 Cal. App.2d 765, 774, 133 P.2d 663 (1943).[9]

With respect to the value paid for UnInstaller, Defendants contend that the $10.6 million which CyberMedia agreed to pay Luckman in cash, royalties and stock was inadequate. Defendants base this contention on their assertion that Luckman acquired MicroHelp for $17.5 million and that MicroHelp's only real asset was UnInstaller. Thus, Defendants contend, UnInstaller was worth approximately $17.5 million, much more than the purchase price.

Defendants introduce no evidence to show that UnInstaller was MicroHelp's only real asset. Additionally, CyberMedia introduces evidence that Luckman aggressively solicited buyers for UnInstaller and that CyberMedia's offer was by far the highest offer that Luckman received. In fact, Defendant Symantec itself made an offer during this process which was less than half the price offered by CyberMedia. An independent valuation of UnInstaller performed at the time of CyberMedia's offer stated that the program was worth between $9.23 and $9.26 million. Accordingly, Defendants' contention that the purchase price was inadequate is unsupported by the record.[10]

In light of the foregoing, the Court concludes that CyberMedia has demonstrated a likelihood of success with respect to the issue of its ownership of a valid copyright in UnInstaller.[11]

---

**8.** CyberMedia raises evidentiary objections to portions of Defendants' evidence on the ownership issue. The Court need not address these objections because, even considering all of the proffered evidence, Defendants have not rebutted the presumption that CyberMedia owns a valid copyright in UnInstaller.

**9.** CyberMedia introduces evidence that Mr. Barry in fact did conduct a substantial due diligence inquiry regarding Luckman's right to transfer UnInstaller. Mr. Barry determined that the MicroHelp shareholders held an interest in UnInstaller based upon promissory notes obtained from Luckman and secured by the program. He subsequently requested and obtained a provision in the UnInstaller purchase agreement permitting CyberMedia to pay off the entire·amount of the MicroHelp shareholders' security interest.

**10.** Defendants contend that the actual purchase price for UnInstaller was $8.3 million, not $10.6 million. The evidence in the record indicates that the purchase price was $10.6 million. However, the Court's analysis would not be affected even if the purchase price were $8.3 million, because it is undisputed that CyberMedia was the highest bidder in an arm's-length transaction for the purchase of UnInstaller. This fact alone indicates that CyberMedia paid a reasonably equivalent value for the program.

**11.** At the hearing, counsel for Symantec argued that the Court should defer ruling on the motion for preliminary injunction pending resolution of the related action proceeding in the Los Angeles

County Superior Court. That action arose out of the MicroHelp shareholders' claims that Luckman has failed to pay them monies owed under the merger agreement. The Court understands that MicroHelp is seeking to set aside Luckman's transfer of UnInstaller to CyberMedia, and that CyberMedia has been brought into that action as a third party defendant. Symantec's counsel argues that the existence of the state court action demonstrates that there is a genuine dispute regarding ownership of UnInstaller. Therefore, counsel asserts, it would be inappropriate for this Court to issue an injunction. The Court finds this assertion unconvincing. The existence of an ownership dispute between an applicant for injunctive relief in a copyright infringement action and a third party does not preclude the issuance of an injunction so long as the applicant meets its burden of demonstrating a likelihood of success on the ownership issue. If the law were otherwise, there would be no mechanism by which either of the parties claiming ownership could prevent wholesale, willful infringement of the copyright. Such a result would be particularly problematic in a case where, as here, there appears to be an alignment of interests between the parties challenging the applicant's ownership interest in the copyright (the MicroHelp shareholders) and the parties allegedly infringing the copyright at issue (including ZebraSoft, which was formed by several of the MicroHelp shareholders).

ZebraSoft also suggests that even if its evidence is insufficient to show that Luckman's sale of UnInstaller to CyberMedia was fraudulent, that same evidence is sufficient to support a

## 2. Copying Of Protected Expression

■ Because direct evidence of copying rarely is available, a plaintiff may establish copying by circumstantial evidence of: (1) the defendant's access to the copyrighted work prior to the creation of the defendant's work; and (2) substantial similarity between the copyrighted work and the defendant's work. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir.1994); *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir. 1989); *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.1987). In demonstrating substantial similarity, the plaintiff may not place any reliance upon similarities resulting from unprotected elements. *See Apple Computer,* 35 F.3d at 1446. Accordingly, unprotected elements must be identified and filtered out before the works are compared. *See id.* Such elements include code dictated by efficiency concerns and functional considerations as well as non-original code derived from material found in the public domain. *See Computer Associates International v. Altai, Inc.*, 982 F.2d 693, 707–10 (2d Cir.1992).

■ There is no question that Defendant ZebraSoft had access to CyberMedia's UnInstaller program prior to the creation of NUD. Several of the ZebraSoft employees who created NUD previously were employed by MicroHelp, where they worked on UnInstaller. Thus, the critical issue is whether UnInstaller and NUD are substantially similar.

CyberMedia's expert, Richard Belgard, presents several exhibits featuring line-by-line comparisons of UnInstaller's source code with that of NUD. As demonstrated by Mr. Belgard, the similarities between the two codes are striking. Line after line of code from the two programs appears identical or nearly identical.

Defendants assert that the similarities noted by Mr. Belgard can be explained by common authorship, functional constraints, and common use of programming tools.[12] This explanation is unpersuasive. Defendants concede, as they must, that any of the hundreds of code lines identified by Mr. Belgard could have been written differently, even as constrained by functional necessity and the use of common programming tools. Common authorship alone does not explain why line upon line of the two codes are identical or nearly identical, even to the extent of containing a common typographical error.[13]

■ Defendants also assert that the lines identified by Mr. Belgard comprise such a small portion of the NUD program as to be insignificant. Where the amount copied is so small as to be *de minimis*, a finding of substantial similarity is not justified. *See Apple Computer, Inc. v. Microsoft Corp.*, 821 F.Supp. 616, 623 (N.D.Cal.1993). However, "[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Baxter,* 812 F.2d at 425; *see also Apple Computer,* 821 F.Supp. at 624 (stating that "quantitatively insignificant infringement may be substantial if the material is qualitatively important to plaintiff's work").

It is undisputed that the code lines identified by Mr. Belgard comprise a relatively small percentage of the NUD program as a whole. However, there is substantial evidence that the files in which these code lines appear are essential to the functioning of the program. Indeed, a page from the NUD project manager's notebook refers to one of the files containing copied code as the "[h]eart of product." Therefore, it cannot be said that

conclusion that CyberMedia comes to this equitable proceeding with unclean hands. Because the Court concludes on the present record that CyberMedia acted in good faith, this suggestion necessarily is without merit.

12. Both UnInstaller and NUD were written in C++ programming language, with the aid of MicroSoft Foundation Classes ("MFC") and MicroSoft Developer Network ("MSDN"). MFC and MSDN contain huge, publicly available li-

braries of C++ code offered by MicroSoft to standardize Windows-based programming.

13. Defendants initially argued that some of the identical code could have come from a "common ancestor code" stored in the home computer library of one of ZebraSoft's programmers. Defendants were given an opportunity to produce credible evidence regarding the existence of a "common ancestor code" in connection with their supplemental briefing but failed to do so.

the identical code is so insignificant as to be *de minimis.*

Based upon the evidence presented, CyberMedia has demonstrated a likelihood of success with respect to this element of its copyright infringement claim. Because the evidence thus supports CyberMedia's showing with respect to both elements it is required to prove, the Court concludes that CyberMedia is likely to succeed on the merits at trial.

## B. Possibility Of Irreparable Injury

 A showing of a likelihood of success on the merits on a copyright infringement claim raises a presumption of irreparable harm. *See Apple Computer, Inc. v. Formula International, Inc.,* 725 F.2d 521, 525 (9th Cir.1984). This presumption may be rebutted by a showing that the applicant unreasonably delayed in seeking injunctive relief. *See Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d 824, 829 (9th Cir. 1997); *Guess?, Inc. v. Tres Hermanos,* 993 F.Supp. 1277, 1286 (C.D.Cal.1997); *see also Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 39 (2d Cir. 1995). However, a reasonable delay caused by a plaintiff's good faith efforts to investigate an infringement will not rebut the presumption. *See Tom Doherty Associates,* 60 F.3d at 39.

 Defendants argue that CyberMedia unreasonably delayed before seeking injunctive relief. In support of this contention, Defendants introduce evidence that CyberMedia waited three months after becoming suspicious about possible infringement before filing suit and waited three additional months before seeking a preliminary injunction.

CyberMedia argues that any delay was caused by reasonable investigation of its claims. CyberMedia presents evidence that it needed several months to investigate its suspicions; present those suspicions to its Board of Directors, engage counsel and file suit. CyberMedia argues that it needed an additional several months after filing suit to conduct discovery and allow its expert to examine NUD's source code.

The Court is satisfied that any delay by CyberMedia in seeking injunctive relief was reasonable, particularly given CyberMedia's showing as to the disparate impact of protracted litigation on the parties.[14] Accordingly, Defendants have failed to rebut the presumption of irreparable injury.

## C. Scope Of Injunction

CyberMedia clearly has demonstrated its entitlement to preliminary injunctive relief. The only question remaining is the scope of the injunction.

CyberMedia requests that Defendants be prohibited from manufacturing or distributing any infringing version of NUD, or any infringing works derived therefrom, *and* that Defendant Symantec be required to recall NUD from all distributors.[15] Symantec argues that ordering a recall would be particularly harsh and would work an injury on the public. Symantec further argues that to the extent any infringement has occurred Symantec is an innocent infringer because it relied upon ZebraSoft's express representations that the NUD program had been created from scratch.

14. CyberMedia is a significantly smaller company than Symantec. The Court notes that CyberMedia soon may be acquired by a much larger company, Network Associates, Inc. However, at the relevant time, CyberMedia understandably displayed caution in deciding whether to sue a company of Symantec's size and resources.

15. At oral argument, CyberMedia made clear that it did not expect Symantec itself to collect the existing copies of NUD from distributors nationwide. The recall requested by CyberMedia would require Symantec to transmit a "Notice of Recall" to all distributors selling NUD, informing them that NUD is an infringing product and that continued distribution of NUD may expose the distributors to liability as contributory infringers. *See* 17 U.S.C. § 106 (granting copyright holder exclusive right to distribute copyrighted work); *Sega Enterprises Ltd. v. MAPHIA,* 857 F.Supp. 679, 686 (N.D.Cal.1994)("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer")(internal quotations and citation omitted).

 Innocent intent generally is not a defense to copyright infringement, and injunctions may be issued without a showing of willful or deliberate infringement. *See Williams Electronics, Inc. v. Artic International, Inc.,* 685 F.2d 870, 878 (3d Cir.1982). There is, however, some authority for the proposition that a court may consider a copyright infringer's innocent intent, as well as potential harm to the public, when fashioning the remedy for infringement. *See Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d 824, 829 (9th Cir.1997); *Abend v. MCA, Inc.,* 863 F.2d 1465, 1479 (9th Cir.1988).

██ Even assuming Symantec's innocent intent,[16] and taking into account potential harm to the public, the Court concludes that ordering a recall of all infringing NUD products is the only effective remedy here. Thousands of NUD products currently are on shelves in retail stores, side by side with UnInstaller. In the absence of a recall order, these products will continue to be sold in direct competition with UnInstaller, depriving UnInstaller of customers it might otherwise have acquired in the absence of Defendants' infringement. *See Gund v. Golden Bear Co., Ltd.,* 27 U.S.P.Q.2d 1549, 1553, 1992 WL 392602 (S.D.N.Y.1992)(finding that recall was the only effective remedy where toys which infringed plaintiff's copyright were in the possession of K–Mart, a nonparty to the action); *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.,* 646 F.2d 800, 807 (2d Cir.1981) (finding recall appropriate where infringing trade dress was likely to divert customers from plaintiff's products to defendant's). In addition, failure to order a recall could lead to a multiplicity of actions by CyberMedia against distributors of NUD. The Court therefore will issue an injunction both prohibiting future distribution of infringing NUD products and requiring recall of unsold infringing NUD products already in the hands of distributors.

The Court notes that Symantec manufactures an international version of NUD at its facility in Ireland. It is unclear whether this Court could enjoin the manufacture and distribution of NUD on foreign soil, or order a recall of NUD products which have been distributed outside the United States. Several cases indicate that CyberMedia may be able to recover *damages* for such manufacture and distribution if it proves that these acts were part of, or a consequence of, an act of infringement occurring within the United States. *See, e.g., Zenger–Miller, Inc. v. Training Team, GmbH,* 757 F.Supp. 1062, 1071–72 (N.D.Cal.1991); *De Bardossy v. Puski,* 763 F.Supp. 1239, 1243 (S.D.N.Y. 1991). There appear to be no reported cases, however, in which the extraterritorial manufacture and distribution of infringing products was *enjoined* on the basis of copyright infringement occurring within the United States. Moreover, even assuming that the Court could enjoin such extraterritorial activity, the Court declines to do so at this time. CyberMedia did not address the issue of Symantec's overseas activities in its papers or at the hearings on the motion. The issue was raised only by Symantec, and then only in a footnote contained in a supplemental reply brief. Accordingly, the injunction will apply only to infringing activity occurring within the United States.[17]

**D. Bond**

██ The Court will, of course, require CyberMedia to post a bond as security for the injunction. The Court concludes that the amount of the bond must take into account

---

16. CyberMedia disputes Symantec's claim of innocent intent, arguing that Symantec had notice of infringement before NUD was released, and that Symantec wilfully continued to market NUD even after CyberMedia filed the present action. The Court need not resolve this dispute, because even accepting Symantec's assertion of innocent intent CyberMedia is entitled to the requested recall. The Court expresses no opinion at this time as to whether Symantec is an innocent or a willful infringer.

17. The Court notes that the present Order is without prejudice to a subsequent motion for preliminary injunction with respect to Symantec's overseas manufacture and distribution of NUD. The Court notes further that the present Order's prohibition on infringing activity occurring within the United States does encompass activity occurring within the United States but contributing to infringement elsewhere, for example, the creation of an infringing version of NUD which subsequently is shipped overseas for manufacture and distribution.

the following factors: (1) profits which Defendants would have earned on NUD sales during the period of the injunction; (2) out-of-pocket expenses related to promotion of Symantec's as-yet-unreleased new suite of products, System Works, of which NUD is a part;[18] (3) damage to Symantec's reputation;[19] and (4) expenses associated with the recall of NUD.[20] All counsel agree that this action will be ready for trial in approximately one year. Symantec presents evidence that its monthly profits on domestic NUD sales are approximately $127,500.[21] Accordingly, the amount of profits which Symantec could expect to lose on NUD sales pending trial is $1,530,000. The parties do not present specific evidence regarding out-of-pocket expenses related to promotion of System Works, damage to Symantec's reputation, or expenses associated with the recall of NUD.[22] Based upon the record before it, the Court finds that reasonable security for these additional items is $100,000. The Court thus

concludes that the amount of the bond should be fixed at $1,630,000.

## III. ORDER

For the foregoing reasons, CyberMedia's motion for preliminary injunction is GRANTED, and the Court ORDERS the following:

(1) Defendants, their officers, directors, employees, servants, agents, and all persons in active concert and participation with any of them who receive actual notice of this Order are prohibited from directly or indirectly infringing CyberMedia's copyrights in the UnInstaller program, and from selling, licensing, leasing, transferring, distributing, reproducing, manufacturing or advertising any version of Norton Uninstall Deluxe, or any other works derived therefrom;

(2) Defendants shall issue a "Notice of Recall" upon all persons or entities that have distributed or are distributing any

---

18. Symantec requests that the bond reflect an asserted $2 million investment in System Works. However, based upon the Court's understanding of the product, the greater part of Symantec's investment will be salvageable in the event that NUD is found to be non-infringing or in the event that Symantec releases a future non-infringing version of NUD. Accordingly, the Court concludes that only Symantec's out-of-pocket promotional expenses which may be lost as a result of the injunction should be considered in setting the amount of the bond.

19. As noted earlier, the Court has made no determination as to whether Symantec is an innocent or a willful infringer.

20. In addition to these items, ZebraSoft requests that the bond reflect its entire net worth. The basis for ZebraSoft's request is its assertion that the majority of its revenues derive from royalties on NUD sales, such that an injunction prohibiting such sales will destroy it. ZebraSoft presents no evidence of its net worth. More to the point, ZebraSoft created the allegedly infringing product. ZebraSoft therefore cannot be heard to complain about a loss of revenues resulting from an injunction prohibiting further infringement.

21. Symantec reaches this figure using an eight month baseline for calculating its estimated monthly lost profits. CyberMedia objects to the use of an eight month baseline, pointing out that the Court used a three month baseline for calculating CyberMedia's lost profits when it required Defendants to post security in connection with

the continuance of the original hearing date on the instant motion. When asked about this discrepancy at the hearing, Symantec's counsel represented that there would be no appreciable difference in the estimated monthly lost profits if those profits were calculated using a three month baseline rather than an eight month baseline. The Court does not have sufficient information to calculate the lost profits using a three month baseline. Accordingly, because the Court does not wish to delay issuance of this Order pending further briefing on the issue of bond, and because Symantec's counsel represented that there would no appreciable difference in the calculations even if the Court were to request further briefing, the Court relies upon the calculations based upon the eight month baseline.

22. Symantec does argue that the expenses associated with any ordered recall should include an "obsolescence reserve" in the amount of $750,000. This figure represents income which Symantec's accountants have recorded ahead of time in anticipation of revenues derived from the sales of NUD products already sent to distributors but not yet sold to end-users. It is unclear to the Court why the bond should reflect Symantec's expectancy that it would receive $750,000 in revenues simply because Symantec chose to pre-record such revenues. Further, it is unclear why the bond should reflect both revenues which Symantec expected to receive from NUD sales, and lost profits on NUD sales for the same period. Accordingly, the Court does not include the $750,000 "obsolescence reserve" in its bond calculations.

version of Norton Uninstall Deluxe or any other works derived therefrom. The Notice shall inform such persons or entities that the distribution of any infringing version of Norton Uninstall Deluxe may expose the distributor to liability as a contributory infringer;

(3) Defendants shall deliver to counsel for Plaintiff any and all copies of Norton Uninstall Deluxe, or any works derived therefrom, for deposit in a bonded warehouse in this judicial district pending the outcome of this action;

(4) Defendants shall return to counsel for Plaintiff any and all copies of source code for any version of UnInstaller or any portion thereof, excluding copies of UnInstaller source code provided to Defendants' counsel in connection with this action;

(5) Paragraphs 1, 2, 3 and 4 of this Order shall not apply to any version of Norton Uninstall Deluxe or any other work which does not infringe Plaintiff's copyright in the UnInstaller program or to acts of Defendants occurring outside of the United States or its territories or possessions; [23]

(6) Within twenty (20) days of service of this Order, each Defendant shall file with the Court and serve upon counsel for Plaintiff a sworn affidavit detailing the manner in which that Defendant has complied with the Order; and

(7) In accordance with Federal Rule of Civil Procedure 65(c), the issuance of this injunction shall be conditional upon Plaintiff's posting of a bond in the amount of One Million Six Hundred Thirty Thousand Dollars ($1,630,000) within fifteen (15) days of the date this Order is filed.

23. After the close of argument in this matter, the Court received an unsolicited supplemental brief from Symantec indicating that it has completed what it considers to be a non-infringing, clean room version of NUD. Subsequently, the Court received an unsolicited brief from CyberMedia responding to Symantec's brief. In the interests of the orderly administration of justice, the Court declines to consider these unsolicited and late-filed briefs. The Court expresses no opinion whatsoever as to the adequacy of Symantec's clean room efforts to date. The Court emphasizes that this injunction applies to all infringing versions of NUD, whether presently in existence or created during the pendency of the injunction.